579 A.2d 1337

**ARMCO ADVANCED MATERIALS CORPORATION and Allegheny Ludlum Corporation, Petitioners,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**WEST PENN POWER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 4, 1990.

Decided July 17, 1990.

Reargument Denied September 13, 1990.

16

18

Michael L. Kurtz, with him, David F. Boehm, Steer, Strauss, White & Tobias, Cincinnati, Ohio, and Robert A. Krebs, Klett, Lieber, Rooney & Schorling, Pittsburgh, for petitioners, Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

J. Tomlinson Fort, with him, W. Franklin Reed and Carl R. Reisacher, Reed, Smith, Shaw & McClay, Pittsburgh, and Michael D. McDowell and John L. Munsch, Greensburg, West Penn Power Co. for petitioner, West Penn Power Co.

Billie E. Ramsey, Asst. Counsel, with him, Lee E. Morrison, Asst. Counsel, Bohdan R. Pankiw, First Deputy Chief Counsel, and John F. Povilaitis, Chief Counsel, for respondent.

Marvin A. Fein, Pittsburgh, with him, John M. Elliott, Stephen C. Braverman, Fern L. McGovern, Arnold S. Block and Scott A. Burr, Baskin, Flaherty, Elliott & Mannino, P.C., Philadelphia, for intervenor, Milesburg Energy, Inc.

Before CRUMLISH, Jr., President Judge, and CRAIG, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

CRAIG, Judge.

In several cases, including an earlier appeal involving this project, captioned *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa. Commonwealth Ct. 81, 546 A.2d 1296, *reargument denied,* 119 Pa. Commonwealth Ct. 81, 550 A.2d 257 (1988) (*Milesburg I*), this court has considered various procedural questions concerning the implementation by the Pennsylvania Public Utility Commission (PUC or Commission) of the federal legislation and regulations designed to encourage the development of cogeneration and small power production from alternative energy sources.

In the present appeals, the other shoe has now dropped, and the issues concern substantive limits on the power of the PUC to approve recovery from ratepayers of costs that an electric utility, West Penn Power Company (West Penn), will incur pursuant to an order of the PUC directing West Penn to enter into an electric energy purchase agreement (EEPA or contract) with Milesburg Energy, Inc. (MEI), which is a "qualifying facility" (QF) for the purposes of section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA).[1] Armco Advanced Materials Corporation and Allegheny Ludlum Corporation (Armco/Allegheny), two large industrial customers of West Penn, and West Penn itself have appealed from the Commission's order.

The principal questions presented are (1) whether the PUC had the authority to order payment to a QF of capacity credits[2] reflecting avoided costs calculated at a time before the QF had made a commitment to deliver capacity, where the applicable FERC regulation requires calculation of avoided costs when the QF has incurred a "legally enforceable obligation for the delivery of energy or capacity", and (2) whether the PUC had the authority to order West Penn to enter into a new EEPA with MEI, after the first contract automatically terminated upon the expiration of a contract

---

**1.** 16 U.S.C. § 824a–3. For discussions of the public policy objectives that Congress sought to promote in enacting PURPA and the promulgation of regulations implementing PURPA by the Federal Energy Regulatory Commission (FERC) see *Milesburg I* and *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa. Commonwealth 259, 563 A.2d 548 (1989). PURPA defines "cogeneration facility" as one that produces both electric energy and steam or some other form of useful energy, such as heat, 16 U.S.C. § 796(18)(A), and it defines "small power production facility" as one that has a maximum production of no more than 80 megawatts (MW) and uses as a primary energy source biomass, waste, geothermal resources or renewable resources such as wind, water, or solar energy to produce electric power, 16 U.S.C. § 796(17)(A). Together they are known as "qualifying facilities".

**2.** Energy costs are the variable costs associated with the production of electric energy—the cost of fuel and some operating and maintenance expenses. Capacity costs are those associated with providing the capability to deliver energy—primarily the capital costs of facilities. *See* 45 Fed.Reg. 12216, the commentary to the original publication of 18 C.F.R. § 292.101, the definitions section of the FERC regulations implementing PURPA.

deadline, where the new contract has a higher but as yet undetermined capacity rate, and the parties previously executed a consent decree stating that MEI would not seek or be entitled to a higher capacity rate.[3]

## FERC Regulations Implementing PURPA

In section 210(a) of PURPA, 16 U.S.C. § 824a–3(a), Congress created a federal statutory duty requiring that electric utilities offer to purchase electric energy from qualifying facilities and directed FERC to prescribe rules implementing that duty. In section 210(b) Congress provided that the rates for such purchases should be just and reasonable to the utility customers and in the public interest, not discriminatory against QFs, and not above the "incremental cost of alternative electric energy", thereby assuring that the overall effect on ratepayers of the PURPA program would be neutral. In section 210(f), Congress designated state regulatory authorities, with their expertise and unique knowledge of local conditions, to be the primary enforcers of PURPA by implementing FERC's rules.

FERC's rule relating to state regulatory authority implementation, 18 C.F.R. § 292.401, provides in part:

(a) *State regulatory authorities.* Not later than one year after these rules take effect, each State regulatory authority shall, after notice and an opportunity for public hearing, commence implementation of Subpart C [relating to arrangements between utilities and QFs under section 210 of PURPA].... Such implementation may consist of the issuance of regulations, an undertaking to resolve disputes between [QFs] and electric utilities arising under Subpart C, or any other action reasonably designed to

---

3. The present case is closely related to two other appeals involving EEPAs between West Penn and North Branch Energy Partners, L.P. for the Burgettstown Project (Nos. 2090 and 2097 C.D.1989) and between West Penn and the Mon Valley Energy Corporation for the Shannopin Project (No. 2091 C.D.1989), which the PUC considered and disposed of in the same proceeding as that involving the contract between West Penn and MEI.

implement such subpart....[4]

FERC's rule relating to rates for purchases by utilities from QFs is 18 C.F.R. § 292.304. In § 292.304(b)(2), FERC exercised its discretion by requiring rates equal to the utility's full "avoided costs" (FAC), defined in § 292.101(b)(6) as "the incremental costs to the electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." [5]

The FERC regulations permit a utility and a QF to negotiate privately and *to agree* to terms different from those prescribed. 18 C.F.R. § 292.301(b). Where, as in the present case, a utility and a QF negotiate a contract, but the utility conditions its obligation to purchase on preapproval from the state PUC of recovery from ratepayers of the contract costs, and submits the contract to the PUC to obtain such approval, the situation does not involve the private agreement contemplated by § 292.301(b). The state PUC's review of such a petition appears to be proper under the § 292.401 grant of authority to take "any other action reasonably designed to implement [Subpart C of the regulations]." In such a case, the state PUC must make a calculation of FAC in order to determine whether the contract rate is at or below FAC and hence reasonable and recoverable.[6]

**4.** Part of the commentary relating to this regulation in the Preamble to the publication of the FERC rules states, "These rules afford the State regulatory authorities ... great latitude in determining the manner of implementation of the Commission's rules, provided that the manner chosen is reasonably designed to implement the requirements of Subpart C." 45 Fed.Reg. 12230–31 (February 25, 1980).

**5.** The United States Supreme Court upheld FERC's decision that rates reflecting *full* avoided cost, rather than passing some of the savings typically realized by cogeneration or small power production on to ratepayers, are just and reasonable to consumers and in the public interest in *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).

**6.** The due process violation that this court identified in *Milesburg I* masked a potential substantive violation in this regard. The PUC calculated a value for FAC and approved the contract capacity rate because it reflected a lower figure. Because the PUC failed to provide

The PUC elected to implement the FERC rules by promulgating its own regulations contained in 52 Pa.Code §§ 57.-31–57.39. *See* 12 Pa.B. 4237 (December 11, 1982). Section 57.32(a) of the PUC's regulations states, "The purpose of this subchapter is to implement the provisions of section 210 of the Public Utility Regulatory Policies Act of 1978...."

## History

MEI and West Penn began negotiating on November 20, 1985, concerning MEI's proposal to establish a 43 megawatt (MW) small power production facility to be fueled by bituminous coal refuse at the site of West Penn's retired Milesburg Power Station (Milesburg Project). West Penn asserts that it reached an oral agreement in principle with MEI on the capacity rate it would pay on May 7, 1986.

On May 27, 1986, West Penn submitted a written price offer to MEI with three different capacity rates for different in-service dates of the facility. The written offer stated that it was valid for six months only, subject to modification for changes in the facility's characteristics, and subject to approval by West Penn's Board of Directors. The capacity rates reflected a federal corporate income tax rate of 46% and a state corporate income tax rate of 9.5%, as well as May 24, 1985, financial forecasts and West Penn's projected need for a generating plant with three 300 MW coal-fired units scheduled to be on-line in 1995, 1997 and 1998, as set forth in the May 1, 1986, Allegheny Power System Generation Capacity Plan. The parties completed a Final Term Sheet on October 27, 1986, which included a provision stating that the term sheet was solely for the convenience of the parties as a basis for ongoing negotiations, not binding on either, and might be changed as to any term,

notice and a hearing, however, no one had the opportunity to point out that the PUC's failure to make its calculations part of the record meant that no one had any way of knowing how the PUC had arrived at its figure. In regard to its approval of a collection of some $10 million per year, the PUC was asking the utility's ratepayers simply to trust it.

including the amount West Penn would pay for energy from the Milesburg Project.

On February 25, 1987, West Penn and MEI formally entered into an Electric Energy Purchase Agreement (EEPA or contract) containing rates based on the estimated avoided costs noted above. West Penn's obligations were conditioned on certification of the Milesburg Project by FERC as a QF, and the existence of a PUC rule or order, final beyond appeal, approving the legality of the contract and rate recovery of West Penn's costs under it. In addition, the EEPA provided for a series of milestone dates, including the Financing Closing Date (date of first closing of initial construction financing) and provided that if that milestone date did not occur "prior to September 1, 1988 for any reason whatsoever, including Force Majeure, this Agreement shall automatically terminate, in which case neither party shall have any further liability to the other hereunder." Armco/Allegheny Exhibit 11 at Section 10.2; R. 65a.

West Penn filed a petition with the PUC on April 2, 1987, requesting an order approving the legality of the contract terms under PURPA and the Public Utility Code and authorizing West Penn to pass its costs under the contract through to ratepayers. Without holding a hearing or making its calculations part of the record, the PUC concluded that the contract capacity rate of 3.3 cents per kilowatt (KWH) hour was less than the PUC's calculated maximum legal rate and so per se reasonable. The PUC entered an order on September 22, 1987, approving the terms of the EEPA and authorizing West Penn to recover its costs. The Office of Consumer Advocate (OCA), West Penn and Armco/Allegheny appealed that order to the Commonwealth Court.

On August 3, 1988, MEI filed a petition requesting the PUC to exercise its authority under section 508 of the Public Utility Code, 66 Pa.C.S. § 508,[7] to relieve MEI from

---

7. This section authorizes the PUC to vary, reform or revise, upon a
   fair, reasonable and equitable basis, any obligations, terms or condi-

the September 1, 1988, Financing Closing Date and all other later deadlines in the EEPA.

This court issued its decision on the appeals of the PUC order approving the contract, *Milesburg I,* on August 22, 1988. We held that before the PUC may approve the legality of a contract for a utility's purchase of power from a QF that includes substantial payments for capacity, due process requires that the utility's ratepayers must be provided with notice of the proceedings and an opportunity to be heard to challenge the proposed action, because such approval by the PUC is adjudicatory in nature and involves substantial property rights of ratepayers. We reversed and remanded for the PUC to reconsider its order after providing adequate notice to ratepayers and an opportunity for them to be heard. The PUC petitioned for reargument.

On September 1, 1988, the PUC adopted a Consent Order entered into by all interested parties that extended the Financing Closing Date in the EEPA to February 28, 1989, unless extended by further order of the PUC, and provided that in any hearing pursuant to this court's order in *Milesburg I* the PUC would consider and determine whether it should order a further extension of the Financing Closing Date. The Consent Order also stated that MEI would not seek or be entitled to any capacity credit higher than that specified in the existing contract. On November 3, 1988, this court denied the PUC's petition for reargument and clarified the court's decision in *Milesburg I* by stating that the rule announced there would be applied prospectively, only. The PUC regained jurisdiction over the proceeding on December 5, 1988, and, on January 19, 1989, entered an order consolidating the Milesburg proceeding for purposes of hearing and decision with three other petitions for approval of EEPAs between West Penn and QFs, including

tions of any contract between a utility and a person, corporation or municipal corporation that embrace or concern a public right or are affected or concerned with the public interest. The PUC must provide notice and a hearing before determining that a contractual provision is subject to modification, and it must prescribe the appropriate new provisions. The modified contract takes effect thirty days after service of the PUC's order on the parties.

those involving the Burgettstown Project and the Shannopin Project.

As the extended Financing Closing Date approached, MEI filed a second modification petition based on section 508 of the Public Utility Code with the PUC, on February 9, 1989, requesting that the EEPA be changed to make the Financing Closing Date 120 days after a final nonappealable PUC order approving the contract. That petition also requested an increase in the capacity rate.

The Administrative Law Judge (ALJ) to whom the case had been assigned granted the relief requested on February 21, 1989, but he rescinded his order on February 27 because no section 508 hearing had been held. On March 3, 1989, MEI filed a petition for an interim emergency order or appeal from the ALJ's February 27 order. West Penn filed a petition for leave to withdraw its original petition for approval of the EEPA on the grounds that the contract had terminated automatically because of MEI's failure to meet the extended Financing Closing Date, and Armco/Allegheny filed a motion to dismiss the original petition on the same grounds. By order entered March 31, 1989, the PUC denied MEI's petition for an emergency order but required all parties to maintain the status quo pending a consideration of the underlying February 9, 1989, modification petition.

The ALJ conducted a hearing on the four consolidated cases over eight days in April of 1989. Although this court in *Milesburg I* had directed the PUC to make its calculation of West Penn's full avoided cost part of the record and to make it available to interested parties before the hearing, no member of the PUC's legal or technical staff participated in the hearing, and the PUC did not make its own calculation of West Penn's full avoided cost with regard to any of the QFs part of the record.[8]

8. After the hearing had started, a counsel for the PUC sent a letter to the ALJ with an attached calculation of the proper capacity rate for a QF with an on-line date of 1990, pursuant to the formula provided in the PUC's regulation, 52 Pa.Code § 57.34(c)(1). The letter stated that

The ALJ bifurcated the hearing into Phase One, concerning the ratemaking issue of the proper capacity rates to be paid to the QFs, and Phase Two, concerning the petition for modification filed by MEI and a similar petition filed by North Branch in regard to the Burgettstown Project, seeking relief from the effect of various contract deadlines, which the developers said they could not meet solely because of litigation delays. As to Phase One, no party challenged the overall method of calculating the avoided costs that was employed by West Penn for all of the contracts, which is somewhat different from the method provided in the PUC's regulation at 52 Pa.Code § 57.34(c)(1), and, the parties agree, yields a lower result. However, Armco/Allegheny challenged various inputs used in the calculation.

The ALJ issued his Recommended Decision on June 27, 1989. On the Phase One issues, the ALJ approved the use of West Penn's method of calculating FAC in these proceedings, while rejecting an attack by OCA on the propriety of the method provided in the PUC's regulations. He concluded that the time of agreement in principle on rates employed by West Penn satisfied the PUC's "time of serious negotiation" standard for determining the point at which to calculate FAC, and he declined to disapprove the use of that standard. Therefore, he concluded that the inputs in West Penn's calculations of FAC were reasonable, and hence that the various capacity credits, including those in the contract with MEI, were at or below West Penn's full avoided costs as determined by either West Penn's formula or the PUC's regulations.

On the Phase Two issues relating to MEI, the ALJ determined that the contract between MEI and West Penn had lapsed and therefore could not be modified. Although he acknowledged that West Penn had a duty under PURPA to purchase from a QF such as the Milesburg Project, he

the attachment was a "personal" calculation, not binding in any way upon the PUC. The ALJ admitted the calculation into the record, but he stated that the unsponsored exhibit was classic hearsay, to which he could give no weight.

concluded that West Penn was not required to do so under a lapsed contract, reasoning that the unforeseen delays caused by the litigation in this case are part of the risk that any developer must bear and that MEI accepted that risk when it entered into the original contract. He also concluded that the Consent Order should operate to bar any increase in the capacity rate for MEI, even if the PUC concluded that the EEPA had not lapsed or was subject to revival.

On September 29, 1989, the PUC entered an order adopting the ALJ's recommendation with regard to the Phase One issues but reversing as to the Phase Two issues. The Commission ordered West Penn to enter into a new EEPA with MEI, with terms and conditions identical to those of the former contract but with the first milestone date extended until six months after the order became final and nonappealable and with a capacity rate increase reflecting the later in-service date of the facility.

### Phase One—Time Frame

In its opinion, the PUC adopted the ALJ's recommendation that West Penn's use of the time of agreement in principle on rates complied with the PUC's standard of time of serious negotiations between the parties as set forth in *Pennsylvania Public Utility Commission v. Duquesne Light Co.*, 64 Pa.P.U.C. 388 (1987). The PUC reiterated its "longstanding policy that avoided costs are to be determined as of the time of serious negotiations." *Re West Penn Power Co.*, —— Pa.P.U.C. ——, ——, 106 PUR 4th 459, 466 (1989).[9] The PUC endorsed the ALJ's comment that no matter what time is used to fix EEPA purchase rates, ratepayers bear a risk that avoided costs will go down and QFs bear a risk that they will go up, and it

9. On this appeal, West Penn has changed its position and now joins Armco/Allegheny in arguing that under the FERC regulations, the time of execution of the contract is the earliest time that may be used for calculating FAC. In the related appeal at No. 2091 C.D.1989, involving the Shannopin Project, West Penn continues to argue in favor of the use of time of agreement in principle on price.

rejected Armco/Allegheny's argument that time of contract execution should control, for the reasons set forth in the reply exceptions of West Penn and the QFs.

In its argument here, Armco/Allegheny notes that a state PUC must apply the FERC regulations in all circumstances except those involving a freely negotiated and executed contract under 18 C.F.R. § 292.301. Where a state PUC must calculate a value for avoided costs, the time as of which those costs are calculated obviously is all-important.

The crucial FERC regulation provides in part as follows:

(d) *Purchases 'as available' or pursuant to a legally enforceable obligation.* Each qualifying facility shall have the option either:

. . . . .

(2) To provide energy or capacity pursuant to a *legally enforceable obligation for the delivery of energy or capacity* over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

(i) The avoided costs calculated at the time of delivery; or

(ii) The avoided costs calculated *at the time the obligation is incurred.*

18 C.F.R. § 292.304(d) (emphasis added). We note that the "legally enforceable obligation" involved is that *of the QF to deliver* energy and capacity; MEI had no such obligation before the execution of the contract. Both the PUC and MEI concede that MEI could have walked away from the transaction at any time up to the moment of signing the contract with no legal liability whatsoever.

Despite the latitude and flexibility that FERC has afforded to state PUCs in view of their primary role in implementing section 210 of PURPA, a state PUC may not contravene the *substance* of FERC's rules.

Next the PUC refers to FERC's commentary in its Preamble relating to the combined effect of § 292.304(d)

and § 292.304(b)(5), permitting rates based on estimates of avoided costs over the specific term of a contract or other legally enforceable obligation to differ from avoided costs at the time of delivery. 45 Fed.Reg. 12224.

The PUC interprets that language as not limiting the definition of avoided costs to those computed as of the time when the QF could be sued in court for damages or specific performance. The PUC asserts that the FERC regulations say nothing about the time frame for avoided cost projections. Noting that the FERC regulations distinguish between "contract" and "legally enforceable obligation", the PUC argues that *only* a contract duly signed by both parties could provide the basis for a suit. The PUC asserts that the "legally enforceable obligation" language was intended to permit a QF to lock in avoided cost projections unilaterally *before* the signing of a contract.

In our view, the PUC's interpretation of FERC's Preamble commentary is half right. The references in that commentary to a QF that has "entered into a contract ... or agreed to obligate itself to deliver ... energy and capacity", "obtained the certainty of an arrangement" and "enter[ed] into a commitment to deliver energy or capacity" clearly describe a QF that has made a binding commitment to deliver energy or capacity, not one, such as MEI at the time of agreement in principle on price, that still has the right to decide whether it will sell power in the first place. Although the "legally enforceable obligation" language does permit a QF to lock in avoided cost projections even without a contract from a recalcitrant utility, the phrase does not encompass a QF that has incurred no obligation at all.

The PUC next points to its regulations implementing the federal regulations and asserts that its regulations permit QFs to lock in avoided costs projections by an "offer of acceptance" of a particular capacity cost credit. The PUC's formula for calculating capacity credits, in 52 Pa.Code § 57.34(c)(1), contains the term "$C_E$", defined as "A utility's total estimated cost of construction of a plant to which the utility is committed as of the date the qualifying facility

offers to accept capacity credits based on that particular plant." The PUC states that the only item required by its regulations is an offer of acceptance, *not* a "legally enforceable obligation". The Commission then presents synopses of twelve cases in which it consistently has applied and refined its "serious negotiations" standard in accordance with the "offer of acceptance" provision of the regulations.

In distinguishing "offer of acceptance" from "legally enforceable obligation" and stating that the latter is not required in Pennsylvania, the PUC essentially admits that its practice contravenes the FERC regulations. The fact that the PUC's practice has been consistent does not make that practice legal.

The PUC also suggests that even if it had established rates in excess of FERC's definition of FAC, its action would not be preempted, citing *Consolidated Edison Co. of New York v. Public Service Commission*, 63 N.Y.2d 424, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984), *appeal dismissed*, 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985). In that case the New York Court of Appeals held that a *state statute* requiring uniform rates for purchases from QFs, frequently in excess of FAC, was valid. The court relied primarily on a statement in the Preamble to the FERC rules to the effect that states could, on the basis of their own authority, prescribe QF purchase rates higher than FAC.

*Consolidated Edison* is clearly distinguishable from the present case. Pennsylvania has no statute authorizing rates in excess of FAC. In fact, Pennsylvania's most nearly relevant statute directs the PUC to require utility rates to the public that reflect savings to the utility from cogeneration. 66 Pa.C.S. § 527. That statute serves as evidence that the Pennsylvania legislature has not purported to grant the PUC authority to prescribe or approve rates for utility purchases from QFs in excess of FAC. Because there is no state law on this point, the issue is not one of preemption; the issue here is whether the PUC has exceeded the bounds of the federal authority delegated to it under PURPA.

Courts in other jurisdictions have considered the issue of the meaning of the phrase "legally enforceable obligation" in FERC's rules. In *Snow Mountain Pine Co. v. Mauldin,* 84 Or.App. 590, 734 P.2d 1366, *review denied,* 303 Or. 591, 739 P.2d 571 (1987), a prospective cogenerator presented a contract to a utility with rates based on the utility's avoided cost schedule then on file with the state public utility commissioner. The utility said it would agree to the contract rate only if the commissioner would permit the utility to pass the rate through to its customers. Negotiations broke down at that point, and the QF filed a complaint with the commissioner seeking to compel the utility to purchase. The commissioner held that the utility had an obligation to purchase as of the date of his order, with rates to be calculated from a later avoided cost filing. Oregon had enacted legislation closely paralleling PURPA, and the commissioner had prescribed administrative rules substantively the same as FERC's regulations.

The Court of Appeals of Oregon first noted that the utility's obligation to purchase QF power was not governed by common law concepts of contract law—the obligation was imposed on the utility by statutes, regulations and rules rather than being voluntarily assumed. Interpreting both 18 C.F.R. § 292.304(d) and the comparable Oregon rule, the court noted that the legally enforceable "obligation" is the QF's obligation to provide energy, and the "time the obligation is incurred" refers to the date on which a binding obligation to deliver energy exists.

> Thus, the regulations and administrative rules contemplate that a qualifying facility's self-imposed obligation *to deliver energy* trigger's a utility's obligation *to purchase energy.* The date on which the qualifying facility obligates itself to deliver energy fixes the date on which the 'avoided costs' are determined.

*Snow Mountain Pine,* 84 Or.App. at 599, 734 P.2d at 1371. After citing the FERC Preamble language stating that use of the term "legally enforceable obligation" was intended to prevent a utility from circumventing its duty to provide the

proper capacity credit simply by refusing to enter into a contract, the court held, "We conclude that a qualifying facility has the power to determine the date for which 'avoided costs' are to be calculated by tendering an agreement that obligates it to provide power." *Id.* at 600, 734 P.2d at 1371.

Similarly, in *Appeal of Public Service Co. of New Hampshire,* 130 N.H. 285, 292, 539 A.2d 275, 279 (1988), the Supreme Court of New Hampshire held:

> The PUC's articulated policy is to treat the filing of a rate petition accompanied by an interconnection agreement signed by the small power producer as a legally enforceable obligation. This is consistent with subsection (ii) of 18 C.F.R. § 292.304(d)(2).[10]

These cases are sensible and persuasive. Where a QF has entered into a contract with a utility, the QF has a legally enforceable obligation to deliver power. Where a QF has done everything within its power to create such an obligation, either by tendering a contract to the utility or by petitioning the PUC to approve a contract or to compel a purchase, and only an act of acceptance by the utility or an act of approval by the PUC remains to establish the existence of a "contract", then the "legally enforceable obligation" contemplated by § 292.304(d)(2) has been created, and the QF is entitled to rates based on avoided costs calculated from the date of the QF's action.

However, the "legally enforceable obligation" we have just described does *not* exist at a time during "serious negotiations" between the parties (whether at the time of agreement in principle on price or otherwise) when the QF

10. *See also In re Inter–Power of New York, Inc.,* 79 Md.P.S.C. 279 (1988). That case involved a complaint by a QF against the parent of West Penn, Allegheny Power System, Inc., and a corporate sister of West Penn, the Potomac Edison Company. The QF sought to prevent the utility from withdrawing price offers that it had made in letters very similar to the original written offers from West Penn in this case, arguing that a "legally enforceable obligation" under § 292.304(d)(2) had been created. The Maryland Public Service Commission rejected the QF's argument, noting that the QF itself admitted that the parties were still in the process of negotiating.

has not yet obligated itself to deliver power and remains free to walk away from the negotiations without liability. In implementing its serious negotiations standard, the PUC has contravened the specific provisions of 18 C.F.R. § 292.304(d), and its policy must be classified as an error of law. In the name of implementing the FERC regulations, the PUC may not adopt a policy that is contrary to those regulations.

The policy reason that gave rise to the PUC's practice of permitting QFs to lock in rates as of the time of serious negotiations is that most cogeneration or small power production projects are project financed, and the early determination of the stream of income facilitates arranging the financing. That is a serious concern; however, such policy considerations may not overcome a contrary result required by law. Furthermore, we believe that the FERC regulations and commentary noted above express a policy of their own. In PURPA Congress conferred an extraordinary benefit on QFs in service of the overall goal of reducing the nation's dependence on unreliable energy sources. QFs may compel utilities to purchase the power they produce, and at a very good price. The FERC regulations and commentary imply that FERC made a deliberate choice not to confer the benefit of capacity credits until a QF was willing and able to make a commitment to deliver power and actually made such a commitment.

Armco/Allegheny also contends that the PUC's order is invalid for failure to consider the many factors that a PUC must consider, to the extent practicable, when setting utility rates for purchases from QFs, as listed in 18 C.F.R. § 292.304(e). As mentioned above, the PUC has prescribed by regulation a method of calculating FAC and capacity credits that it believes satisfies the requirements of the FERC regulations. In this case the PUC employed a method proposed by West Penn that, the parties agreed, provided an accurate assessment of FAC while yielding lower results than the Commission's method. However, Armco/Allegheny did not challenge the West Penn method

before the Commission but rather objected to certain specific inputs. Hence, Armco/Allegheny cannot be heard to complain here for the first time that the necessary factors were not considered.

### Phase Two—New EEPA Issues

On the Phase Two issues relating to the Milesburg Project, the PUC reversed the ALJ. The Commission agreed with the ALJ that MEI's EEPA had lapsed, rendering modification of that contract under § 508 of the Public Utility Code a moot point, but the Commission stated:

> Nevertheless, Milesburg has been endeavoring to obtain an approved power purchase agreement with West Penn since 1986. Although West Penn does not have a legally enforceable obligation to purchase power under the lapsed 1987 EEPA, it does have a legally enforceable obligation under PURPA 210 to purchase Milesburg's power at rates determined in accordance with West Penn's avoided cost projections in effect in 1986. The Commission has the responsibility to enforce the provisions of PURPA 210 in Pennsylvania. Milesburg has requested rates based on West Penn's methodology, which we have determined to be the appropriate benchmark of avoided costs in these proceedings. Milesburg has done nothing to waive its entitlement to rates based on avoided costs as of the time of serious negotiations. Therefore, it is our responsibility to require West Penn to enter into a new EEPA with Milesburg, identical in terms with the lapsed EEPA, with extensions to the millstone [sic] dates and revised capacity rates that reflect the Project's later in-service date. Specifically, we will require a financing closing date six months after the issuance of a final nonappealable Order, with similar extensions to related milestones.

— Pa. P.U.C. ——, ——, 106 PUR 4th 459, 481 (1989).

The PUC ordered that the capacity rate in the new contract reflect the later in-service date of the Milesburg Project and ordered that the Consent Order adopted by the

PUC on September 1, 1988, be interpreted as requiring MEI not to seek a capacity rate increase for the six months that it was in effect. Therefore, six months would be deducted from the previously anticipated financing and construction period of thirty-six to forty-two months to arrive at a new in-service date of thirty months after a final order, for the purpose of calculating the new capacity credit. The PUC approved the ALJ's recommendation revising the West Penn method of calculating FAC to reflect monthly rather than yearly payments to the QF, which results in a slightly lower capacity credit. The Commission rejected the ALJ's suggestion that MEI should be required to seek a new evidentiary proceeding, because such a requirement probably would kill this project and would give substantive effect to regulatory litigation delays. The PUC agreed with the ALJ that the bill insert notice already provided before the hearing in these proceedings was adequate, despite requested modifications to the capacity rate in the course of the proceedings.

 Our analysis of the Phase Two issues is informed by our discussion of the Phase One issues, principally, by the points that a negotiated contract conditioned on PUC approval is *not* the privately negotiated contract contemplated by 18 C.F.R. § 292.301, and that FERC has granted state PUCs broad authority to accomplish the purposes of § 210 of PURPA, so long as their actions are consistent with the FERC regulations. We note that no party has challenged the fundamental principle that a PUC has the power to order a utility to enter into a contract with a QF.

As noted by the court in *Snow Mountain Pine Co.*: [The utility's] obligation is not governed by common law concepts of contract law; it is created by statutes, regulations and administrative rules.... Thus, the obligation to purchase power is imposed by law on a utility; it is not voluntarily assumed.

84 Or.App. at 598–99, 734 P.2d at 1370.

 A utility's submission of its contract with a QF to the PUC for approval is legally equivalent to a petition by

the QF to the PUC to compel the utility to enter into that contract. In our view, such a petition necessarily invokes the full power and duty of the PUC to examine all of the contract's terms and conditions to ensure that they are in compliance with the FERC regulations implementing PURPA. This principle applies to terms relating to milestone dates as well as terms relating to price. The situation is not significantly different from one where a QF simply petitions the PUC to compel a utility to purchase. The PUC must order a rate for such a purchase equivalent to the full avoided costs, 18 C.F.R. § 292.304(b)(2), and the PUC may not order terms or conditions for the purchase in any way contrary to the FERC regulations, or contrary to the goals of PURPA.

■ The question underlying most of the Phase Two issues is the degree to which a QF has the power to bargain away the rights and advantages conferred on it by PURPA, or, conversely, the extent of the power of the PUC to rescue a QF from a bad bargain. Where a utility privately negotiates and executes a contract with a QF, the parties may agree to virtually anything, and the terms of their agreement are legal and enforceable. However, when the utility chooses not to accept the risk that rates it has negotiated will be proper and recoverable, but conditions its obligations on preapproval by the PUC, then the utility subjects the entire agreement to the scrutiny of the PUC and incurs the risk that the PUC may modify other provisions of the contract if it concludes that they are not in accordance with PURPA and the FERC regulations.

■ In the present case, the PUC has handled the problems created by the expiration of a milestone date in a submitted contract, due to litigation delays, by giving effect to that expiration, but then ordering the utility to enter into a new contract, substantially identical to the old one, but with adjustments to the capacity rates reflecting the effects of the delay. The Commission's action is equivalent to treating the submission of the contract by the utility as a petition by the QF, and then declining to approve a rigid

milestone provision in the contract that would have the effect of allowing regulatory litigation delay to kill this otherwise acceptable and desirable project. As the PUC's opinion indicates, the power it exercised was its federally delegated power under PURPA. That power is different from the PUC's power under the state Public Utility Code, and it is not constrained by the provisions of state law.

██ West Penn first raises a procedural challenge to the PUC's ordering it to enter into the new EEPA with MEI, arguing, on the basis of *Milesburg I*, that the Commission was required to provide ratepayers notice and a hearing before it issued such an order. Unlike the contract approval at issue in *Milesburg I*, the order under review here did not spring full-grown from the head of the PUC. As the description of the history of this case and the analysis above indicate, the Commission's order was in response to the original petition for approval of the EEPA, and it was entered only after an ALJ conducted an exhaustive hearing preceded by bill-insert notice. Having provided notice and a hearing with regard to the overall proceeding, the Commission satisfied the requirements of *Milesburg I.*

West Penn next asserts that the PUC committed an abuse of discretion in ordering it into a contract with indefinite milestone dates, because fixed milestones are necessary for the protection of West Penn's ability to conduct orderly capacity planning. The PUC and MEI respond that the milestone extensions are not as open-ended as West Penn suggests; when these proceedings finally end, the milestone dates will be fixed. By requiring a financing closing date six months after the issuance of a final nonappealable order, with similar extensions to related milestones, the PUC has retained the sensible protections afforded to the utility by the use of milestone dates, but it has eliminated the effect of regulatory litigation delays. In our view, the PUC has full discretion in the exercise of its powers under PURPA and the FERC regulations to encourage the development of cogeneration and small power production to

ensure that litigation delays do not become the factor that determines whether a project proceeds or fails.

■ Armco/Allegheny challenges here the propriety of the Commission's ordering the capacity rate in the new EEPA to be based on the later in-service date for this project, arguing that a just and reasonable capacity rate cannot be developed by selectively choosing input assumptions over a multi-year period. The Commission's holding on this point was as follows:

> With respect to the capacity rates, we find no inconsistency with reflecting the Project's later in-service date in the calculation under West Penn's methodology. All of the inputs regarding West Penn's avoided costs will remain the same. The in-service date is not a component of West Penn's avoided costs, or the cost of the 300 MW coal unit, but a component in the calculation of the QF's ability to defer or avoid West Penn's projected costs. West Penn's avoided *costs* do not change with changes in a Project's in-service date. Rather, a change in the in-service date changes the capacity *credit* while keeping West Penn's avoided *costs* constant.

—— Pa. P.U.C. at ——, 106 PUR 4th at 481. The PUC is correct on this point. Had the parties originally anticipated an in-service date as late as the one that will now occur, the capacity credit would have been higher to reflect the closer match to the actual capacity needs of the utility. The PUC's accounting for that fact is simply one aspect of its efforts to approve a contract that has not been altered to the detriment of the QF by the delays resulting from this litigation.

■ Finally, both Armco/Allegheny and West Penn contend that the PUC erred by failing to hold that the Consent Agreement entered into by the parties and adopted by the Commission on September 1, 1988, bars any increase in the capacity rate that MEI will receive. West Penn stresses the common law contract interpretation principle that an agreement that is clear on its face should not be rewritten by courts or agencies. Armco/Allegheny complains that

the PUC's interpretation of the Consent Agreement was completely novel, not having been advanced by any party.

The PUC's arguments, that the Consent Agreement lapsed along with the original contract or that the Commission's interpretation is justified because its staff was involved in the negotiations that led to the agreement, are not persuasive. Nevertheless, the PUC's decision was within its discretion. Had the parties privately negotiated and executed a contract, common law principles would apply. Because they do not, the PUC must be guided by the overriding concern of implementing the policies of PURPA in its treatment of the relationship between them. Where the PUC has the power under PURPA and the FERC regulations to order the execution of a new contract after the previous one expired, then it certainly has the power to withhold ongoing effect from the QF's agreement not to seek a capacity increase to which it might otherwise be entitled.

### Conclusion

Our scope of review of PUC adjudications is limited to determining whether constitutional rights were violated, an error of law committed or a finding of fact was not supported by substantial evidence. 2 Pa.C.S. § 704; *T.W. Phillips Gas and Oil Co. v. Pennsylvania Public Utility Commission*, 81 Pa. Commonwealth Ct. 205, 208, 474 A.2d 355, 358 (1984).

On the Phase One issues in this case we have concluded that the PUC erred as a matter of law in applying a "time of serious negotiations" standard for determining at what point the avoided costs of a utility should be calculated. Accordingly, we shall reverse on this point and remand to the Commission with instructions that the PUC calculate MEI's capacity cost credit according to West Penn's method, using inputs appropriate for the time when West Penn and MEI executed their contract. No party has challenged the Commission's approval of a modification to West Penn's method to account for monthly payments to the QF, and

that modification should be employed in the calculation. The PUC must produce a calculation that is binding upon it, and it must make that calculation part of the record of this proceeding. If the calculated capacity credit is lower than the rate to which Milesburg previously agreed, the PUC must offer Milesburg the opportunity to decline to proceed with the project. The PUC need not provide another hearing with reference to the calculation ordered here. For due process reasons, however, the PUC must communicate its results to the parties and permit the submission of written objections, should any party wish to challenge the accuracy of the calculation.

On the Phase Two issues, the PUC properly exercised its authority under the FERC regulations implementing PURPA to order West Penn to enter into a contract with MEI identical to the one the parties originally negotiated, but with the adjustment noted above for monthly payments, and with extensions to the milestone dates. Because we also approve the PUC's ordering calculation of a capacity credit reflecting an in-service date thirty months after the entry of a final nonappealable order by the Commission, and the calculation ordered above should incorporate that input, we affirm the PUC's decision on these points.

Finally, we note that this case involves a question of first impression, the resolution of which could not have been clearly foreshadowed. Accordingly, our intention is that the decision shall have only prospective effect. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

## ORDER

### (Nos. 2092 and 2074 C.D. 1989)

NOW, July 17, 1990, the Order of the Pennsylvania Public Utility Commission at Docket No. P–870216, entered September 29, 1989, is affirmed in part and modified in part. The order is modified so that the direction to West Penn Power Company to enter into an Electric Energy Purchase

Agreement with Milesburg Energy, Inc., with terms and conditions identical to the 1987 EEPA between the parties, shall provide that calculation of the capacity cost credit shall relate to factors in existence at the time the EEPA was signed, February 25, 1987, rather than as of the time of serious negotiations between the parties. The order is affirmed in all other respects.

This case is remanded to the Commission with instructions for the Commission to make a new calculation of the capacity cost credit, according to the method of calculation employed by West Penn through these proceedings, with the adjustment for monthly rather than yearly payments noted in the Commission's opinion. Such calculation shall use inputs appropriate for February 25, 1987, but with an in-service date thirty months from the time that the Commission's order becomes final and nonappealable. In addition, the financing closing date shall be six months from the time that the Commission's order becomes final and nonappealable, and other milestone dates shall be adjusted accordingly. The Commission shall make its calculation part of the record of this proceeding, and it shall supply copies to the parties, allowing a reasonable period for the submission of written objections to the calculation. Should the new capacity rate prove to be less than that to which the parties initially agreed, the PUC shall offer Milesburg Energy, Inc. the opportunity to decline to proceed with the project.

Jurisdiction relinquished.

CRUMLISH, Jr., former President Judge, did not participate in the decision in this case.