677 A.2d 831

**PENNSYLVANIA ELECTRIC COMPANY, Appellant,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1996.

Decided June 19, 1996.

Reargument Denied Aug. 14, 1996.

476

Alan Michael Seltzer, Jeffrey A. Franklin, Reading, for Appellant.

Lee E. Morrison, Harrisburg, for PUC.

Clifford B. Levine, Pittsburgh, for CMS/American—Intervenors.

Alice B. Mitinger, Pittsburgh, for American/CMS.

Earle H. O'Donnell, Zori G. Ferkin, Kathleen A. Foudy, Washington, DC, Leroy S. Zimmerman, Harrisburg, Joseph M. Ramirez, Pittsburg, for LG&E—Intervenor.

Mark J. Shaw, Erie, for Intern. Paper Co.—Intervenor.

Tanya J. McCloskey, Harrisburg, for Office of Consumer Advocate—Intervenor.

David M. Kleppinger, Harrisburg, for GPU Indus.—Intervenor.

William T. Hawke, Harrisburg, for Cambria Partners—Intervenor.

Donna M. Attanasio, Washington, DC, pro hac vice.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

*OPINION OF THE COURT*

FLAHERTY, Justice.

This is an appeal by allowance from an order of the Commonwealth Court which affirmed in part and reversed in part an order of the Pennsylvania Public Utility Commission (PUC). At issue is the proper application of a regulatory requirement that electric utilities purchase power from outside sources.

The Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 824a–3, encourages the use of alternative energy sources, such as cogeneration and small power production facilities, for the generation of electric power. PURPA mandates that states create legal mechanisms to compel regulated electric utilities to purchase needed power from such sources instead of building additional capacity or acquiring power from other regulated utilities. The Federal Energy Regulatory Commission (FERC) has promulgated regulations under PURPA. 18 C.F.R. § 292.101 et seq. The regulations provide leeway, within the bounds of FERC requirements, for state regulatory authorities to implement PURPA. Accordingly, the PUC adopted implementation regulations. 52 Pa.Code § 57.31 et seq.

The PUC regulations denominate as "qualifying facilities" (QFs) various non-utility suppliers of electric power. 52 Pa. Code § 57.31. Electric utilities are required to enter long-term agreements to purchase power from QFs if the utilities have a demonstrated future need, within a ten-year time frame, for generating capacity that QFs can provide. 52 Pa.Code § 57.34. Compensation for QFs is limited by the regulations in accordance with a PURPA requirement that compensation not exceed a utility's "avoided costs," i.e., the costs that the utility would have incurred for a similar amount of electricity generated in-house or purchased from another utility. *Id.* See generally 16 U.S.C. § 824a–3(b) (avoided costs).

The practical effect of PURPA is to divert potential profits from regulated electric companies, whose earnings are largely

based on the value of their owned facilities, to the owners of QFs.

In 1991, three QFs petitioned the PUC to order the Pennsylvania Electric Company (PECO), appellant herein, to enter power purchase agreements. The QFs proposed to supply varying amounts of power, the total of their proposals being for five hundred eighty megawatts of capacity. PECO opposed all three petitions on the ground that it did not have a need for such capacity.

During 1992, extensive hearings were held by an administrative law judge on the question of PECO's future energy needs. Needs during the ten-year period commencing with the spring of 1991 were examined. Based on the record of those hearings, the PUC determined that PECO would need approximately one hundred sixty megawatts of additional capacity by the year 2000.

The PUC assigned priorities to the competing QFs based on the extent of their development, the quality of existing utility service in their locales, the viability of the various proposals, and the sequence in which the QFs filed their petitions with the PUC. PECO was then directed to enter long-term purchase agreements with two of the QFs, namely LG & E Energy Systems, Inc. (LG & E) and American Power Corporation/CMS Generation Company (American/CMS). LG & E and American/CMS were to provide eighty megawatts of capacity apiece. The PUC specified that if either of these QFs failed to enter agreements with PECO then a third QF, Cambria Partners, would be substituted.

An appeal was taken to the Commonwealth Court. That court affirmed the PUC's decision in most respects, but reversed in part and remanded for a recalculation of the avoided costs that determine compensation payable to the QFs.

At issue in the present appeal is the proper time for determining PECO's needs and avoided costs for additional capacity. PECO asserts that these are to be determined as of the date when a QF incurs a "legally enforceable obligation" to supply power. PECO further asserts that none of the peti-

tioning QFs ever incurred such obligations. Hence, according to PECO, no determination of needs and avoided costs should have been made by the PUC.

The PUC ruled that capacity needs and costs were to be determined in proximity to March 21, 1991. That was when the first of the three QFs filed a petition asking the PUC to order PECO to purchase capacity. The other two QFs filed petitions soon thereafter.

The date selected for evaluation of need and cost factors is significant, for it limits the range of evidence that the PUC will consider. For example, the PUC, in concluding that PECO would need at least one hundred sixty megawatts of additional capacity, relied on PECO's 1991 Annual Resource Planning Report (ARP) estimate of capacity needs. PECO contends that developments after publication of the 1991 ARP substantially reduced or eliminated the need for additional capacity. Such developments were described in PECO's 1992 ARP, which was filed in the spring of 1992 after proceedings to determine PECO's energy needs had commenced. The PUC declined, however, to consider the 1992 ARP, reasoning that capacity needs were to be determined as of the time when proceedings were initiated, namely, the spring of 1991.[1]

1. While focusing its inquiry on the spring of 1991 to determine future capacity needs, the PUC described the types of subsequent developments that would nevertheless be taken into account:

[W]e will not in all circumstances refuse to consider subsequent events that unquestionably alter utility requirements bearing on their relationships with qualifying facilities. If a subsequent event has a direct and irrevocable effect on utility planning; if it is a discrete and quantifiable effect; and, if the event has actually occurred, rather than being speculative, we will consider the effects of such an event on utility needs. Such an event might be the catastrophic loss of a generating station that could not be returned to service. On the other hand, such an event would *not* include changes in annual filings made during the course of a proceeding, even if such filings reflect more likely occurrences in certain input assumptions. We think this is a rule of common sense: we will not cause either benefit or penalty to utility or qualifying facility due to shifts in *assumptions* from those made when the matter was first placed before the Commission. On the other hand, we will not take actions causing either over or under-capacity due to failure to recognize the impact of a subsequent known event with clear and dramatic consequences to the utility. Since that is not the case here, there is no compelling reason

PECO claims that the PUC, by ignoring the 1992 ARP and other post–1991 evidence of reduced capacity needs, grossly overestimated the need for additional capacity. It is further asserted that, because PECO's costs are passed directly through to ratepayers, ratepayers will ultimately bear the burden of paying for this unneeded capacity.

PECO's argument that capacity needs and costs are not to be determined unless a QF has incurred a legally enforceable obligation to supply power is based on regulatory requirements that were analyzed in *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission,* 135 Pa.Cmwlth. 15, 579 A.2d 1337 (1990), aff'd. per curiam, 535 Pa. 108, 634 A.2d 207 (1993) (*Milesburg II* ) (per curiam affirmance being unanimous in part and by an equally divided court in remaining part), cert. denied, —— U.S. ——, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994).

*Milesburg II* focused on a FERC regulation by which QFs are provided with options as to the manner in which they can sell energy or capacity to electric utilities. Those options, set forth in 18 C.F.R. § 292.304(d), are as follows:

(d) Purchases "as available" or *pursuant to a legally enforceable obligation.* Each qualifying facility shall have the option either:

(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

(2) To provide energy or *capacity* pursuant to a *legally enforceable obligation* for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

to grant the request of ... [PECO] for official notice of their documentary filings [1992 ARP].

(i) The avoided costs calculated at the time of delivery; or

(ii) The *avoided costs calculated at the time the obligation is incurred.*

(Emphasis added.)

The plain import of this regulation is that energy can be supplied on an "as available" basis or pursuant to a legally enforceable obligation, but capacity is to be supplied only pursuant to a legally enforceable obligation.[2] Further, a QF supplying capacity can opt to have avoided costs calculated as of the time the legally enforceable obligation was incurred.

Based on *Milesburg II* the PUC concluded that where, as in the present case, a utility denies that it needs to purchase capacity and therefore does not negotiate a purchase agreement with a QF, the relevant date for determining power needs and avoided costs—implicitly the date of a legally enforceable obligation recognized by 18 C.F.R. § 292.304(d)— is when the QF files a petition requesting the PUC to order that a purchase be made. The Commonwealth Court likewise treated that date as being when energy needs and costs became determinable. We find no error and thus affirm.

In the portion of *Milesburg II* that was affirmed per curiam by our equally divided court, the lower court stated:

Where a QF has entered into a contract with a utility, the QF has a legally enforceable obligation to deliver power. *Where a QF has done everything within its power to create such an obligation,* either by tendering a contract to the utility or *by petitioning the PUC* to approve a contract or *to*

2.  52 Pa.Code § 57.34(c)(7)(i) likewise requires that payments for capacity be made in conjunction with a legally enforceable obligation. It provides:

(7) Capacity credit. A fee will be paid to the qualifying facility, in addition to energy credits, under the following circumstances:

(i) Eligibility. A qualifying facility is eligible for a capacity credit as stated in this subchapter only if it enters into a *contract or other legally enforceable obligation* with the purchasing utility, including termination notice requirements and sanctions for noncompliance, for a minimum term of 10 years from the estimated date when capacity credits are sought.

(Emphasis added.)

*compel a purchase,* and only an act of acceptance by the utility or *an act of approval by the PUC remains* to establish the existence of a "contract," then *the "legally enforceable obligation" contemplated by § 292.304(d)(2) has been created, and the QF is entitled to rates based on avoided costs calculated from the date of the QF's action.* 135 Pa.Cmwlth. at 33, 579 A.2d at 1347 (emphasis added).

The lower court in *Milesburg II* held that a legally enforceable obligation did not exist at an earlier time, to wit, when the parties were engaged in serious negotiations and the QF was still free to walk away from the negotiations without liability. *Id.* at 33–34, 579 A.2d at 1347. The three members of our court who dissented to the per curiam affirmance of this portion of the lower court's decision believed that the PUC's recognition of a legally enforceable obligation during the period of serious negotiations when agreements in principle as to price had been reached was not error. They expressed no disagreement, however, with the language quoted above insofar as it recognizes a legally enforceable obligation if a contract has been signed or a petition to compel a purchase has been filed with the PUC. In short, they simply would have allowed recognition of the obligation at an earlier stage.

The present case is not one where a legally enforceable obligation was alleged to exist with respect to QFs that had merely engaged in negotiations with a utility company about capacity purchases. Rather, here the QFs filed petitions with the PUC seeking to compel purchases of capacity. They did this, the PUC concluded, because PECO denied its need for capacity and refused to negotiate contracts. Hence, each QF fulfilled the *Milesburg II* requirement, supra, of doing "everything within its power to create such an obligation ... by petitioning the PUC ... to compel a purchase...." Further, a compulsory purchase was made dependent only on "approval by the PUC," and thus, "the 'legally enforceable obligation' contemplated by § 292.304(d)(2) has been created, and the QF is entitled to rates based on avoided costs calculated from the date of the QF's action." *Milesburg II,* supra.

Under *Milesburg II,* the term "legally enforceable obligation" employed in 18 C.F.R. § 292.304(d) is not limited to obligations arising from actual contracts. Obviously, the mere filing of a petition with the PUC does not create a contract between a utility and a QF. However, the filing is deemed to create an obligation that enables the QF to have pricing determined under 18 C.F.R. § 292.304(d), allowing avoided costs to be calculated as of the time the obligation was incurred.

A utility is not free to claim that it has no need for additional capacity and refuse to negotiate contracts with QFs when in fact it does need to add capacity. PURPA *requires* utilities to make purchases from QFs when a need exists that QFs can fulfill. In cases where a utility denies the existence of its needs, there must be a means for compelling a capacity purchase. Otherwise, the aims of PURPA would be frustrated.

Any capacity purchase necessarily involves the determination of a utility's needs and avoided costs. To hold that a contract to supply capacity must be executed before a QF can "lock in" needs and avoided costs would allow utility companies to impede the development of QFs by denying needs and refusing to negotiate contracts. Determining need and cost factors with reference to the date when a QF files a petition to compel a purchase is a reasonable course and is the approach endorsed by *Milesburg II.*

Further, this approach has been reviewed by the FERC and has been approved as being within the bounds of discretion accorded the PUC. Specifically, after the Commonwealth Court's decision was rendered in this case, PECO filed a petition with the FERC asking it to take action to stop enforcement of the PUC's order. PECO asserted that the PUC and the Commonwealth Court had improperly determined that a legally enforceable obligation arose when the petition to compel a purchase of capacity was filed with the PUC. The FERC rejected this argument and denied relief. It stated:

This practice of determining avoided costs as of the filing of a petition was a result of the state court *Milesburg II* decision, which invalidated the preexisting [PUC] practice of setting avoided cost as of the time of serious negotiations between the parties.

. . . .

Petitioners suggest an interpretation of our PURPA regulations (in particular, of 18 C.F.R. § 292.304(d) (1994)) that would not allow an avoided cost determination to be made until such time as a utility actually agrees to enter into a binding contract. As they themselves state, . . . "there may be occasions where a utility fails to cooperate in the timely execution of a contract." It appears that this has, in fact, been the case. The record is replete with . . . [PECO's] relentless refusal to cooperate with QF developers, as well as . . . [PECO's] endless legal and regulatory appeals.

As we stated in *West Penn* [*West Penn Power Co.*, 71 F.E.R.C. ¶ 61,163 (1995) ]:

It is up to the States, not this Commission, to determine the specific parameters of individual QF purchase agreements, including the date at which a legally enforceable obligation is incurred under State law.

*Metropolitan Edison Co. and Pennsylvania Electric Co.*, 72 F.E.R.C. ¶ 61,015, 61,050 (1995) (footnote omitted.)

In response to the FERC decision, PECO filed a petition for reconsideration. The FERC denied the petition and stated:

[PECO's] argument concerning when a legally enforceable obligation has been incurred implicates the ability of the [PUC] to determine the date on which the avoided cost purchase rate should be calculated. . . . [T]his is appropriately a matter for the states to decide in the first instance. We decline [PECO's] invitation to upset the [PUC's] determination, based on a Pennsylvania court decision, to calculate avoided cost as of the date the QF has tendered a contract to the utility or has petitioned the [PUC] to approve a contract or compel a purchase. . . .

*Metropolitan Edison Co. and Pennsylvania Electric Co.,* 72 F.E.R.C. ¶ 61,269, 62,184 (1995). The FERC further stated that the PUC's approach to determining avoided cost "represents a reasonable exercise of its implementation authority under PURPA." *Id.*

The PUC did not err, therefore, in calculating capacity needs and avoided costs as of the date when the petition to compel a purchase was filed. This approach was consistent with *Milesburg II* and was within the bounds of the PUC's authority under PURPA. Hence, the Commonwealth Court properly affirmed the PUC's decision in this regard.

Order affirmed.

NEWMAN, J., did not participate in the consideration or decision of this case.