623 A.2d 383

**WEST PENN POWER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent,**

**ARMCO ADVANCED MATERIALS CORPORATION and Allegheny Ludlum Corporation, Petitioners,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 21, 1992.

Decided March 10, 1993.

Drew Kovalak, for petitioner West Penn Power Co.

Michael L. Kurtz, for petitioners Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

Lee E. Morrison, Asst. Counsel, for respondent.

Clifford B. Levine, for intervenor Mon Valley Energy Corp.

Before CRAIG, President Judge, and DOYLE, COLINS, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

PELLEGRINI, Judge.

West Penn Power Company (West Penn) and Armco Advanced Materials Corporation and Allegheny Ludlum Corporation (Industrials), two large industrial customers of West Penn, appeal an order of the Public Utility Commission (PUC), recalculating West Penn's avoided cost as being supplied power by Mon Valley Energy Company's (Mon Valley) Shannopin plant rather than having to construct its own capacity.[1] The PUC order was issued as a result of this

1. The Public Utility Regulatory Policies Act of 1978 (PURPA) and implementing regulations promulgated by the Federal Energy Regulatory Commission (FERC) regulate West Penn's purchase of power from Qualifying Cogeneration Facilities. PURPA was part of a package of five pieces of legislation known collectively as the National Energy Act. Section 210 of PURPA, 16 U.S.C. § 824a-3, is designed to lessen the dependence on foreign oil and material gas by encouraging the development of alternative power sources in the form of cogenerators and

court's order in *Armco Advanced Materials Corporation and Allegheny Ludlum Corporation v. Pennsylvania Public Utility Commission*, No. 2091 C.D. 1989, memorandum opinion filed July 17, 1990 (*Shannopin I* ), directing the PUC to recalculate the capacity credit costs reflecting the avoided costs West Penn proposed to pay for energy purchased from Mon Valley's Qualifying Cogeneration Facility (QF).[2] The recalculation was necessary because the PUC had calculated costs at the time there were "serious negotiations" rather than at the time there was a "legally enforceable obligation" between West Penn and Mon Valley.[3]

The PUC interpreted our order to require recalculation of only the corporate tax rate component of the avoided cost, contending that was the only component challenged by West Penn and the Industrials and raised in *Shannopin I*. West Penn and the Industrials appealed that interpretation, assert-

small production facilities. *Barasch*, 119 Pa.Commonwealth Ct. 81, 85, 546 A.2d 1296, 1298 (1988), *reargument denied*, 119 Pa.Commonwealth Ct. 115, 550 A.2d 257 (1988) (*Milesburg I* ).

2. PURPA defines "cogeneration facility" as one that produces both electric energy and steam or some other form of useful energy, such as heat, 16 U.S.C. § 796(18)(A), and "small power production facility" as one that has a production capacity of no more than 80 megawatts (MW) and uses as a primary energy source biomass, waste, geothermal resources or renewable resources such as wind, water or solar energy to produce electric power. 16 U.S.C. § 796(17)(A). Together, they are commonly known as "qualifying facilities" or QFs.

3. Our Order reads as follows:

NOW, July 17, 1990, the order of the Pennsylvania Public Utility Commission at Docket No. P–880286, entered September 29, 1989, is affirmed in part and modified in part. The order is modified so that the approval of the Electric Energy Purchase Agreement between West Penn Power Company and Mon Valley Energy Corporation shall provide that a calculation of the capacity cost credit shall relate to factors in existence at the time the EEPA was signed, October 15, 1987, rather than as of the time of serious negotiations between the parties. The order is affirmed in all other respects.

This case is remanded to the Commission with instructions for the Commission to make a new calculation of the capacity cost credit, according to the method of calculation employed by West Penn through these proceedings, with the adjustment for monthly rather

ing that they challenged the entire avoided cost calculation as evidenced by the plain language of our opinion and order purportedly requiring recalculation of all components of the avoided cost.

As with most QFs in Pennsylvania which had entered into voluntary agreements with the utilities to purchase their power, Shannopin has a long and complex legal history both before the PUC and this court. It began on September 10, 1986, when West Penn and Mon Valley agreed in principle that West Penn would purchase energy from a Mon Valley proposed Shannopin plant in lieu of West Penn building a coal-fired facility.[4] Based on the avoided cost to West Penn, a proposed rate of $.04 per kilowatt hour (KWH) for the QF energy was to be charged to West Penn's ratepayers and paid to Mon Valley.[5] With the proposed capacity rate unchanged,[6]

than yearly payments noted in the Commission's opinion. Such calculation shall use inputs appropriate for October 15, 1987.

. . . . .

4. Mon Valley planned to build an 80 MW QF at the Shannopin Mine in Greene County. Under the agreement, the Shannopin Project was to replace part of a coal-fired power plant comprised of three–300 MW units that West Penn had scheduled to be in service in 1995, 1997 and 1998.

5. The calculation of the rate to be charged for QF energy is based in part on the utility's passthrough to ratepayers of avoided capacity costs. Capacity costs are those energy costs associated with providing the capability to deliver energy, primarily the capital costs of facilities. *See* the preamble to the publication of 18 C.F.R. § 292.101, the definitions section of the regulations promulgated by FERC pursuant to PURPA, 45 Fed.Reg. 12216. Avoided costs means the incremental cost to an electric utility of electric energy or capacity or both, which, but for the purchase from the qualifying facility, such utility would generate itself or purchase from another source. 18 C.F.R. § 292.101(b)(6) (4–1–86). Avoided costs are calculated when "a qualifying facility offers energy of sufficient reliability and with sufficient legally enforceable guarantees of deliverability to permit the purchasing electric utility to avoid the need to construct a generating unit, to build a smaller, less expensive plant, or to reduce firm power purchases from another utility, then the rates for such a purchase will be based on the avoided capacity and energy costs." *Id.*

6. In the September 1986 agreement in principle, West Penn had calculated the avoided cost for the coal-fired facility, in part, on a federal corporate tax rate of 46% and a Pennsylvania corporate tax rate of 9.5%. However, at the time the contract was finalized, the Tax Reform Act of 1986, P.L. 99–514, 100 Stat. 2085, had decreased the

West Penn and Mon Valley entered into an agreement for the purchase of the QFs. The agreement, however, was conditioned upon the PUC's approval. Approval was necessary to insulate West Penn from complaints that the rate of power from the plant was too high or the capacity was excess.

When West Penn filed a petition with the PUC seeking approval of the agreed-to rate recovery amounts, the Industrials opposed, arguing that the proposed rate was improperly calculated. Without a hearing, the PUC rejected the Industrials' challenge and issued a Tentative Opinion and Order approving West Penn's petition. However, in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296, *reargument denied,* 119 Pa.Commonwealth Ct. 115, 550 A.2d 257 (1988) (*Milesburg I* ), we held that because the approval of an electric energy purchase agreement (EEPA) by the PUC was adjudicatory in nature and involved substantial property rights of ratepayers, due process required that a utility's customers must be provided with notice of and an opportunity to comment on the proposed action. Relying on that decision, the PUC withdrew its Tentative Opinion and Order and consolidated the Shannopin Project petition with related West Penn/QF contract cases.

As with all the cases involving QFs, in Shannopin's proceeding, there was an issue as to whether the avoided cost calculation should be made at the time there were "serious negotiations" (September 10, 1986) or when there was a "legally enforceable obligation" to purchase power (October 15, 1987). The PUC found that the avoided cost was to be calculated at the time there were "serious negotiations" between the utility and the QF because that was when the utility made its calculation to determine its avoided costs and whether it would enter into the agreement.

The Industrials appealed the decision of the PUC to this court, claiming that the proposed rate should be calculated at

federal corporate tax rate to 40% in 1987 and then 34% in 1988. The Pennsylvania rate had decreased from 9.5% to 8.5% on January 1, 1987.

the time there was a "legally enforceable obligation," stating that the lower corporate tax rates in effect at the time the contract was finalized would result in a lower calculation of avoided cost. In the reported *Armco Advanced Materials v. Pennsylvania Public Utility Commission,* 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990) (*Milesburg II* ), we held that under FERC regulations, the time when a QF executes a contract with a utility or when it otherwise does everything in its power to create a legally enforceable obligation to deliver energy and capacity is the time when the PUC must calculate the utility's avoided costs to determine the reasonableness of the proposed contract rates. Applying the *Milesburg II* holding, we directed in our *Shannopin I* opinion that:

> The Commission calculate West Penn's full avoided cost and corresponding capacity cost credit according to West Penn's method and using tax rates in effect at the time Mon Valley and West Penn executed their contract, which was the first time Mon Valley had done everything in its power to incur a legally enforceable obligation to deliver energy and capacity.

Upon remand, the PUC entered an order directing that the interested parties submit recalculations of the proposed capacity rate based solely on the change in corporate tax rates that occurred between the time of "serious negotiations" and a "legally enforceable obligation." After receiving recalculations from West Penn, Mon Valley and the Industrials, the PUC accepted the recalculation submitted by Mon Valley because it was the only recalculation that reflected changes in the corporate tax rates.[7] West Penn and the Industrials recalculated the rate by updating all the compo-

7. In support of its petition, the Industrials included the deposition testimony of Stephan J. Baron as an expert witness. Baron recalculated the avoided cost, changing the avoided capacity and proxy unit factors, as well as the tax rate factors. Mon Valley's response to the petitions for reconsideration included the sworn statement of Dale J. Buras as an expert witness. Buras recalculated the avoided cost, changing only the tax rate figures, including system energy need filings made by West Penn from 1986 to 1987 to support Mon Valley's position that avoided capacity and the appropriate proxy unit were unchanged from 1986 to 1987.

nents of avoided cost. This appeal followed.[8]

■ At issue in this case is whether the PUC improperly implemented our remand order in *Shannopin I* by only recalculating corporate tax rates as of the date there was a "legally binding agreement" and not recalculating all the other factors as of that date that make up that rate. The PUC and Mon Valley contend that it was proper for them to recalculate just the corporate tax component to determine avoided cost. They argue that in *Shannopin I*, that was the only component of avoided cost that the Industrials claimed changed between the time of "serious negotiations" and "binding agreement." Because the accuracy of other components of the avoided cost were not raised in the previous appeal, they contend those components were not placed at issue and were waived. They further argue that our order in *Shannopin I* only requires the PUC to recalculate avoided cost by changing the corporate tax rates to reflect the rate at the time there was a legally enforceable agreement.

To the contrary, the Industrials and West Penn assert that they argued in *Shannopin I* for recalculation of all components of the avoided cost that may have changed between the time of serious negotiations and the finalized agreement/legally enforceable obligation. They argue that corporate tax rates were only specifically questioned to illustrate the difference in what the avoided cost would be if it was calculated at the time of a "serious negotiation" or a "legally enforceable agreement"[9] and to show that the "serious negotiation" standard

8. When additional evidence has been taken on remand and the PUC has made findings of fact and conclusions of law, our scope of review is limited to a determination of whether the PUC abused its discretion or committed an error of law. *Omiridis v. Zoning Hearing Board of the City of Chester*, 110 Pa.Commonwealth Ct. 247, 531 A.2d 1196 (1987).

9. West Penn and the Industrials contend that using the ten year projection period in the calculation methodology purportedly accepted by all parties, a recalculation of West Penn's capacity need as of October 1987 would reflect zero capacity need. As a result, they contend that the rate should reflect zero avoided capacity cost. Alternatively, they argue if the calculation time period is extended to the point where there is a projection for capacity need, 2003/2004 approximately seventeen years from the contract date, the avoided capacity rate would be between $.0051 and $.0078/KWH.

was unworkable and why the complete avoided cost calculation (not just taxes) should be calculated when the contract was signed. Moreover, even if we determined that they only raised the issue of corporate taxes, they argue that our holding, changing the date when the avoided cost is to be calculated, mandates that all the components of avoided cost be recalculated as of that date. We agree.

Our order in *Shannopin I* directed that a recalculation be made relating to "factors in existence at the time the [agreement] was signed," and that the calculation was to "use inputs" appropriate for October 15, 1987, when there was a "legally enforceable agreement." The language of our order indicated that we anticipated more than a single factor or input would be recalculated by the PUC in order to comply with the requirement that calculation of avoided costs be made at the time of a legally enforceable obligation. The order anticipated a recalculation encompassing all avoided cost figures as of October 15, 1987.[10]

> The difference between the PUC rate and the rate proposed by West Penn is approximately $28,800,000 per year over the thirty year term of the contract, or $864,000,000. In part, they contend that this lower rate is based on changing the "proxy" unit that Mon Valley's Shannopin plant would replace from coal fired to a gas turbine plant that has a lower cost to operate. They contend that the gas turbine plant "proxy" is appropriate because West Penn no longer needs an increase in its base load, but its "peak" load to be supplied by a gas turbine plant.
>
> The PUC and Mon Valley disagree, however, maintaining that at the time of the contract signing in October 1987, West Penn's filings demonstrated 900 MW of unmet capacity need which West Penn planned to purchase from seventeen unidentified and four identified qualifying facilities, with the proxy unit remaining a coal-fired plant.
>
> Assuming the PUC did not have an independent obligation to examine the filings, and West Penn is bound by those filings, the Industrials are not bound and the PUC is obligated to make a finding as to what is the appropriate "proxy."

10. Pursuant to Pa.R.A.P). 2116, Mon Valley filed a Motion to Quash or, alternatively, limit the scope of West Penn and the Industrials' appeal, contending that this appeal is limited by the statement of questions presented by the Industrials in its March 27, 1990 brief filed in *Shannopin I*. Because what is at issue here is what we ordered in *Shannopin I*, what we decide that order meant was before us in that proceeding. The Motion is denied.

A total recalculation was inevitable as a result of the outcome in *Shannopin I* of changing when avoided cost was to be calculated. Whether the capacity rate of power purchased from a QF is "just and reasonable" to the consumer is, in part, based on time-sensitive data, e.g., tax rates, interest rates and capacity needs. In *Shannopin I* and *Milesburg II*, at issue was the appropriate time to conduct a review. The resolution of that issue determined whether the corporate tax rate was correctly calculated. But it did more. By holding that the PUC used the wrong date to conduct a review of the agreement, we held that the entire calculation of avoided costs was erroneous, not just one element of that calculation. By fixing as the "polestar" the date that the parties entered into a "legally enforceable obligation," we required the PUC to determine as of that date whether the avoided cost component of the capacity cost agreed to by the utility and the QF was "just and reasonable" to the ratepayers. 18 C.F.R. § 292.304(d)(2). Because a determination of whether an avoided cost element of the capacity cost credit is fair is based on time sensitive data, the PUC cannot change just one element to obtain an accurate calculation. It has to make that determination as if that calculation had not been made before and examine all the elements that determine avoided cost. That result is the same as if we found that the PUC used the wrong "test year" to determine a utility's revenues and expenses. If that occurred, the PUC is required to re-examine all the data, not just an item or two.

More importantly, this outcome is mandated by PURPA. Although that regulatory scheme permits utilities and QFs, as they did here, to negotiate private agreements for the purchase of power independently of the prescribed rates, 18 C.F.R. § 292.301, "privately negotiated contracts setting rates for QF power are essentially outside the federal and state rules; state public utility commissions have the duty to examine such contracts claimed by the utility for the purpose of setting its own rates." *Barasch (Milesburg I),* 119 Pa.Commonwealth Ct. at 90, 546 A.2d at 1300 (1988). Under PURPA, the PUC is required to determine whether the cost of pur-

chased power is "just and reasonable to the electric consumers and in the public interest." 16 U.S.C. § 824a–3(b) and 18 C.F.R. § 292.304(a). Otherwise, ratepayers would be required to subsidize the QF.[11] Moreover, if it approves the agreement, the PUC agrees never to include in any excess power calculation power purchased from Mon Valley under this agreement.[12]

■ Our holdings in *Milesburg II* and *Shannopin I* that PURPA mandates that avoided cost be calculated at the time there is a "legally enforceable obligation" require the PUC to determine as of that date whether the cost to consumers of the contract is just and reasonable, including whether consumers will be required to pay for excess capacity. This obligation imposed on the PUC is not diminished by whether or not any ratepayer intervenes to oppose approval of the agreement and is not limited to only those issues that intervenors raise.

Accordingly, the order of the PUC recalculating the capacity cost for the Shannopin project is vacated. This case is remanded to the PUC to make a new calculation of capacity cost credit using inputs and criteria appropriate for October 15, 1987.

11. Congress did not intend the ratepayers to subsidize their construction or operation. The Conference Committee stated:
> The provisions of this section are not intended to require the ratepayers of a utility to subsidize cogenerators or small power producers. H.R.Conf.Rep. No. 95–1750, pp. 97–98 (1978); reprinted in 1978 U.S.C.C.A.N. 7831–7832.

12. Where the PUC determines that a utility is producing excess capacity, it may exclude the value of the property producing the excess from the rate base and disallow the utility's return on that property. Section 1310(d) of the Public Utility Code, 66 Pa.C.S. § 1310(d), states that:
> Whenever the commission . . . shall be of the opinion that any rates of such public utility are producing a return in excess of a fair return upon the fair value of the property of such public utility, used and useful in its service, the commission may, by order, prescribe for a trial period of at least six months, . . . temporary rates . . .

"Used and useful in its service" is interpreted by the PUC to mean whether a property's total capacity is commensurate with the requirements for peak demand, plus a reasonable reserve margin relative to the system and obligation. *Pennsylvania Power and Light Company v. Pennsylvania Public Utility Commission*, 101 Pa.Commonwealth Ct. 370, 516 A.2d 426 (1986).

## ORDER

AND NOW, this 10th day of March, 1993, the order of the Pennsylvania Public Utility Commission dated May 22, 1992, Docket No. P–880286, is vacated. This case is remanded to the PUC to make a new calculation of capacity cost credit using inputs and criteria appropriate for October 15, 1987. Mon Valley's Motion to Quash is denied.

Jurisdiction is relinquished.