**ARMCO ADVANCED MATERIALS COR-PORATION and Allegheny Ludlum Corporation, Petitioners,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**WEST PENN POWER COMPANY, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 8, 1995.

Decided July 20, 1995.

As Amended Aug. 25, 1995.

Order Modifying and Restating Order on Reconsideration Sept. 25, 1995.

---

8. In reversing this Court's decision in *Porreca*, our Supreme Court determined that the lack of inquiry into the defendant's affirmative response to a written plea colloquy question regarding existence of threats or promises made to persuade him to enter a guilty plea mandated a remand for a new guilty plea colloquy.

9. Once again, in answer to the trial court's protestations that the Legislature never intended to confer this discretion upon the prosecution, we echo *footnote 9* of this Court's decision in *Commonwealth v. Biddle, supra*, wherein we stated that the legislature has not seen fit to amend section 7508 in light of this Court's interpretation

of similar statutory language. Moreover, we cannot concur with the sentencing court's statement at sentencing which implies that our Legislature is ignorant of subsequent court interpretation of its legislation. *See* N.T., 2/1/94, at pp. 41–42 ("Oh, good Lord, Mr. Sachs, do you think any [of our legislators] ever read *Pittman*?").

10. Because this disposition may disturb the sentencing scheme of the court below, Appellee's judgment of sentence is vacated in its entirety. *See generally, Commonwealth v. Goldhammer*, 512 Pa. 587, 517 A.2d 1280 (1986), *cert. den.*, 480 U.S. 950, 107 S.Ct. 1613, 94 L.Ed.2d 798.

Michael L. Kurtz, for petitioners Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

Theresa J. Colecchia, for petitioner West Penn Power Co.

Lee E. Morrison, Asst. Counsel, for respondent.

Clifford B. Levine, for intervenors, Mon Valley Energy Corp.

Before PELLEGRINI and FRIEDMAN, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

West Penn Power Company (West Penn) and Armco Advanced Materials Corporation and Allegheny Ludlum Corporation (Industrials), two large industrial customers of West Penn, petition for review of an order of the Pennsylvania Public Utility Commission (PUC) recalculating the amount West Penn is to pay for power from a qualifying facility [1] (QF) called the Shannopin project to be built by Mon Valley Energy Corporation (Mon Valley). West Penn and the Industrials contend the amount to be paid for this power is excessive because the PUC used improper factors in calculating the amount to be paid for power produced by the Shannopin QF. The amount to be paid for QF power ordered by the PUC here was based on a recalculation of the avoided cost in response to a remand from this court, in *West Penn Power Company v. Pennsylvania Public Utility Commission,* 154 Pa.Commonwealth Ct. 136, 623 A.2d 383, *appeals discontinued,* 535 Pa. 662, 665, 634 A.2d 225, 227 (1993) (*Shannopin III*). We directed the PUC to make a new calculation of the amount to be paid to a QF, called the capacity cost rate, using inputs and criteria appropriate for October 15, 1987, the date of the "legally enforceable obligation" between West Penn and Mon Valley.

I.

To understand the issues in this case, it is first necessary to give the history of the Shannopin QF.[2] The Shannopin QF project was one of a number of projects agreed to by West Penn so that the purchase of QF power would replace its portion of a 900 MW, coal-fired power station comprised of three units at one facility which was planned by West Penn's parent company, Allegheny Power Systems, Inc.[3] The first unit of the power station was planned to come on-line in 1995, the second and third units in 1997 and 1998. After lengthy negotiations, on October 15, 1987, the parties had entered into an electric energy purchase agreement (EEPA) for the Shannopin project. The agreement stated that Mon Valley would build the Shannopin facility to be an 80 MW output coal-fired cogeneration facility with a steam host. The EEPA had a term of thirty years and origi-

---

1. A "qualifying facility" or QF is the common term for cogeneration facilities and small power production facilities as defined in the Public Utility Regulatory Policies Act of 1978 (PURPA), and the implementing regulations promulgated by the Federal Energy Regulatory Commission (FERC). A "cogeneration facility" is one that produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A). A "small power production facility" is one that has a production capacity of no more than 80 megawatts (MW) and uses as a primary energy source biomass, waste, geothermal resources or renewable resources such as wind, water or solar energy to produce electric power. 16 U.S.C. § 796(17)(A).

2. For a discussion of PURPA and how it relates to the history between West Penn and Shannopin and related QFs, see *West Penn Power Company v. Pennsylvania Public Utility Commission,* 659 A.2d 1055 (Pa.Cmwlth.1995).

3. The 900 MW power station was planned to meet the power needs of several subsidiaries of Allegheny Power Systems, Inc. The other subsidiaries also became involved in QF purchase arrangements to otherwise meet their needs.

nally stated Shannopin would come on line in September of 1992. The EEPA provided that Mon Valley would receive a capacity credit of 4 cents per kilowatt hour for capacity, based on West Penn's calculation of its avoided costs[4] for a portion of the planned 900 MW power station. The avoided costs contained in the EEPA were based on West Penn's projections at the time of "serious negotiations" with Mon Valley in September of 1986. At the same time, West Penn made agreements with two other QFs so that the three combined would replace its portion of the 900 MW plant. The anticipated power station was expected to meet West Penn's demand for power beginning in 1995. Because of litigation delays, the Shannopin QF has not yet been built.

One of the other QF projects that was intended to replace the 900 MW power station was being developed by North Branch Energy Partners (now Washington Power Company) at Burgettstown. The EEPA for that QF project was signed on the same date the EEPA was signed for Shannopin, and the Burgettstown project would also be an 80 MW cogeneration facility. The EEPA with Burgettstown provided for a capacity cost rate of 3.6 cents per kilowatt hour and the term of the EEPA was for 33 years rather than the 30–year term of the EEPA for Shannopin. The capacity cost rate was lower for the Burgettstown project because it was expected to be in service as of October of 1991, whereas Shannopin was not expected to be in service until September of 1992, and, to a lesser extent, because it was for a three-

year longer term. It too has not yet been built, and the approval of the Burgettstown project and its avoided cost rate has taken a parallel course with the litigation for the Shannopin project.

The litigation for both projects began almost immediately after the signing of the contracts, albeit initially it was amicable between the QFs and West Penn. In January of 1988, West Penn filed a petition with the PUC seeking approval of its EEPA with Mon Valley and seeking assurance that it would be able to recover all of the payments to the QF from ratepayers. After giving notice and an opportunity to be heard to West Penn's customers,[5] the PUC approved the EEPA and the pass-through of costs associated with it. On appeal, this court reversed the PUC in an unpublished decision, holding that the calculation of avoided costs under PURPA should not be based on the time of "serious negotiations" but instead should be based on the date of a "legally enforceable obligation".[6] We remanded the case for a recalculation of capacity cost rate as of October 15, 1987, the date of the contract signing. *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission,* No. 2091 C.D.1989, filed July 17, 1990, *petition for allowance of appeal denied,* No. 545 W.D. 1990, filed November 19, 1991 (*Shannopin I*). See also the related decision in *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission,* 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990), *affirmed per curiam,* 535 Pa. 108, 634 A.2d 207 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994) (*Milesburg II*).[7]

---

4. Avoided costs are calculated when a QF "offers energy of sufficient reliability and with sufficient legally enforceable guarantees of deliverability to permit the purchasing electric utility to avoid the need to construct a generating unit ... then the rates for such a purchase will be based on the avoided capacity and energy costs." 18 C.F.R. § 292.101(b)(6).

5. The participation of West Penn's customers was permitted after this court's decision in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988), *petition for allowance of appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989) (*Milesburg I*), a decision in regard to one of the related QFs.

6. The legally enforceable obligation refers to the time the QF makes a binding commitment to

deliver energy and capacity and generally is the time a contract is signed between the QF and the utility. The serious negotiations standard refers to an agreement in principle on price, but does not oblige the QF to sell power in the first place.

7. While *Shannopin I* was pending, Mon Valley requested that the PUC extend certain milestone deadlines in the EEPA due to litigation and other delays. Milestone deadlines are conditions on the QF in the EEPA such as the date by which a good faith deposit must be made, or the date by which financing for the facility is closed. Apparently, based on subsequent forecasts, West Penn submitted evidence in an attempt to demonstrate that it no longer needed the capacity that was bargained for in the EEPA. The PUC extended the milestones as requested by Mon Valley and refused to consider whether West Penn currently

On remand, the PUC interpreted our decision to require recalculation of only the corporate tax rate component of the capacity cost rate, contending that it was the only component challenged by West Penn and the Industrials. The PUC directed all parties to submit proposed calculations of a capacity cost rate based on corporate tax rates in effect October 15, 1987, and for various potential in-service dates. The PUC issued an order adopting the calculations of Mon Valley and entering an order recalculating the cost rate. West Penn and the Industrials appealed.

Reversing the PUC, we held that by fixing as the "polestar" the date that the parties entered into a "legally enforceable obligation," PURPA requires the PUC to determine as of that date whether the avoided cost agreed to by the utility and the QF was just and reasonable to ratepayers. *Shannopin III,* 154 Pa.Commonwealth Ct. at 145, 623 A.2d at 387. Because that determination is made on time-sensitive data and the avoided cost is set as of that date, we held that the PUC has to make the determination by reexamining all of the elements that determine the avoided cost, rather than just one element. *Id.* Again, we remanded for a recalculation of the amount to be paid for power produced by the Shannopin QF. It is the PUC's calculation of the amount paid for QF power on the remand that is before us now.

## II.

■ The amount to be paid for QF power is based on the avoided cost. The "avoided cost" essentially represents the amount of money a utility would otherwise spend if it had to construct a facility to produce needed energy or to purchase it from another source, rather than purchasing it from the QF. *See* 18 C.F.R. § 292.101(b)(6). Section 210(b) of PURPA, 16 U.S.C. § 824a–3(b), establishes that rates for QF purchases may not be greater than the full avoided costs of the utility.[8] *See also* 18 C.F.R. § 292.304(a)(2); *American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983); *Milesburg II.*

While avoided costs is the basis for the amount to be paid, the rate to a QF supplying electric power from the purchasing utility, as set under the terms of the EEPA, is known as the capacity cost rate or capacity credit. 52 Pa.Code § 57.31.[9] The capacity cost rate is intended to reflect the ability of the QF to allow the utility to avoid the planned generating facility or another power purchase, and to reflect how closely the QF matches the utility's need for capacity. *Milesburg II.* If the QF comes on-line on the same day as the avoided plant was planned to come on-line and all other factors are the same, the capacity cost rate for the period of the contract would equal the avoided cost (over the period of the contract).

While the avoided cost never changes, the capacity cost rate changes when there is a change in the QF's in-service date because some factors in the calculation for the rate are time-sensitive, for example the cost of capital and construction costs, and a discount rate is applied to adjust for those factors.[10]

---

needed the capacity it had agreed to. On appeal from that decision, this court affirmed the PUC in *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 150 Pa.Commonwealth Ct. 349, 615 A.2d 951 (1992), *petition for allowance of appeal denied,* 536 Pa. 631, 637 A.2d 291 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994) (*Shannopin II*). We held that, because West Penn legally agreed it had a need for capacity when it made the agreement with Mon Valley, it cannot at a later date change the terms of the agreement because it believes that, based on hindsight information, it made an erroneous decision.

8. Avoided costs may be calculated at the time the legally enforceable obligation is incurred, and rates calculated as of such time will meet the statutory and regulatory requirements even if they differ from avoided costs at the time of

delivery. 18 C.F.R. § 292.304(b)(5) and (d)(2). FERC has determined that PURPA permits "lock-ins," that is, fixed-rate long-term QF contracts. *In re West Penn Power Company,* 71 F.E.R.C. P61,153 (order denying petition for declaratory order, May 8, 1995).

9. Capacity costs are those costs associated with providing the capability to deliver energy—primarily the capital costs of facilities. *See* 45 Fed. Reg. 12216, the commentary to the original publication of 18 C.F.R. § 292.101, the definition section of the FERC regulations implementing PURPA.

10. This is reflected in both the PUC's methodology for calculating capacity cost rates in the regulations and in West Penn's methodology by the application of a fixed charge rate. *See* 52 Pa.

Where the parties bargain for an in-service date that is close to the planned in-service date for the avoided facility, the capacity cost rate is higher to reflect a close match to the actual capacity needs of the utility, and for an earlier in-service date, the capacity cost rate is lower to reflect the amount of time it is in-service prior to the time the utility is projected to need the power. *Milesburg II*, 135 Pa.Commonwealth Ct. at 39, 579 A.2d at 1350. Using the Burgettstown QF as an example, if the contract had set an in-service date of October 1, 1995 for the QF, the date of the planned avoided facility, the capacity cost rate would have been set at 5.71 cents per kilowatt hour, but the contract set an in-service date of four years before October of 1995, and the analogous capacity cost rate was set at 3.6 cents per kilowatt hour.

In response to a petition for recalculation filed by Mon Valley after the remand order, the PUC issued a tentative order on February 3, 1994 recalculating the avoided cost rates for the Shannopin project and setting a capacity cost rate. With the tentative order, the PUC issued a set of calculations purportedly based on the West Penn methodology for calculating payments to QFs, as submitted in the original Shannopin III recalculation proceeding. However, while West Penn's calculations were based on the avoided costs of the total power station in-service as of October 1, 1995, the PUC extended the calculations to establish a range of rates based on QF in-service dates from October 1994 through October 1998. The tentative order calculations produced capacity rates varying from 4.9538 cents per kilowatt hour, to a maximum rate of 8.0151 cents per kilowatt hour, for concomitant project on-line dates ranging from October 1, 1994 to October 1, 1998. (R.R. 398a, 402a–418a).

The PUC stated that it was relying on factors used for the capacity cost rate calculation for the Burgettstown project because that calculation was approved by this court in *Armco Advanced Materials Corporation v.*

*Pennsylvania Public Utility Commission*, 157 Pa.Commonwealth Ct. 150, 629 A.2d 221 (1993), *petition for allowance of appeal denied*, 537 Pa. 642, 644 A.2d 165, *cert. denied*, —— U.S. ——, 115 S.Ct. 315, 130 L.Ed.2d 277 (1994) (*Burgettstown II*), and was used by both West Penn and Mon Valley. In *Burgettstown II*, the PUC directed all parties to submit their recalculations of the avoided costs based on factors known at the time of the legally enforceable obligation, i.e., October 15, 1987. The PUC adopted the calculations of North Branch which, considering inputs at the time of the legally enforceable obligation, established a range from 4.91 cents per kilowatt hour based on an in-service date of July 1, 1994, to 5.71 cents per kilowatt hour based on an in-service date of October 1, 1995, or a later in-service date. This court affirmed those calculations in *Burgettstown II*.[11]

West Penn and the Industrials responded to the PUC's tentative order by filing several motions:

- a motion for summary judgment arguing that Mon Valley is no longer a QF because it's original steam host, Shannopin Mining Company, is bankrupt and it had to find a new one.
- a motion for reconsideration arguing that a hearing must be provided on the recalculation because the adjudication is a rate case and involves a large amount of costs affecting the public.
- exceptions arguing that, if the calculations used in *Burgettstown II* are applicable, then the maximum capacity rate that can be set for Shannopin is 5.593 cents per kilowatt hour because that was the capacity rate set in *Burgettstown II* for a QF coming on-line on October 1, 1995, or thereafter.

The PUC denied all of the motions and adopted the rates set forth in the tentative order with the maximum rate at 8.0151 cents per kilowatt hour for an on-line date in 1998.

Code § 57.34(c)(1) and R.R. 402a. The fixed charge rate represents those costs that change over time, such as the cost of debt or cost of capital.

11. West Penn and the Industrials appealed the PUC's decision contending that the recalculations were in error because they provided sufficient evidence that, as of the October 15, 1987,

the power was not needed. We held in *Burgettstown II* that hindsight information could not be relied on by the utility to establish it did not need power at the time it agreed to purchase power from the QF, and that the avoided cost calculation must be determined on factors known as of the date the legally enforceable obligation was incurred. *Id.*, at 159, 629 A.2d at 226.

The PUC stated that if a developer loses its QF status, the EEPA is no longer valid; some non-crucial changes in a project does not mean it is no longer a QF. It noted that Mon Valley promptly found a new steam host when its host went bankrupt and that the steam host was not specified in the EEPA. Also, if West Penn questions the QF status of the Shannopin project, the PUC stated, it could file a petition with FERC, noting that whether Shannopin maintained sufficient site control is beyond the scope of the remand order and outside of its jurisdiction. The PUC also held that this is not a rate case and because the PUC's role is limited, no additional hearings are warranted.

■ As to whether the maximum rate set in *Burgettstown II* should apply, the PUC stated:

> Mon Valley should not be penalized because the Shannopin Project will come on line in late 1995 or thereafter. The project was originally intended to avoid a combination of the three base load plants scheduled for 1995 through 1998. The original calculations of avoided capacity costs were based on that understanding. The basis for the calculations will not be altered here. Further, that the Shannopin contract is for three years less than the Burgettstown contract is irrelevant here. The capacity payment was based on West Penn's anticipated costs to build three base load coal plants and broken down to a price per kilowatt hour (kWh).

(PUC's opinion and order of December 1, 1994, slip op. at 11). West Penn and the Industrials then filed these appeals.[12]

### III.

■ At issue is the propriety of the PUC's translation of the avoided cost into the capacity cost rate. West Penn and the Industrials contend the PUC erred as a matter of law by ordering a capacity cost rate that exceeds West Penn's avoided cost as determined in *Burgettstown II*. The Shannopin rate of 8.0151 cents per kilowatt hour is forty percent higher than the maximum rate for Burgettstown, and the maximum rate for Burgettstown is set for an in-service date of October 1, 1995 or thereafter. Because both projects were contracted on the same date to avoid the blended costs of the 900 MW power station, they assert both projects should have substantially the same rates and those rates cannot exceed West Penn's avoided costs as calculated based on data available at the time of the EEPA.

The difference in rates is largely based on extending the on-line dates beyond October 1, 1995 to October 1, 1998 for Shannopin. West Penn and the Industrials contend that the PUC abused its discretion:

● by extending the on-line dates of the QF beyond the date when the avoided cost for the power station was determined;

● by ignoring the fact that the EEPA was meant to avoid a power station, including the sunk costs associated with the first unit, rather than a single unit of the power station;

● by mistakenly assuming West Penn's methodology could be used for on-line dates after 1995 resulting in the unintended compounding of costs;[13] and,

● by failing to properly update all of the inputs in the avoided cost calculation as required by this court's remand order.

Examining the EEPA and the course of conduct between the parties at the time of the contract, the parties understood that:

● The QF projects were agreed to in order for West Penn to avoid building the 900 MW station as a whole, and the avoided costs for the QFs were based on the costs to West Penn for building the power station.

---

12. Our scope of review of a decision of the PUC is to determine whether constitutional rights have been violated, or an error of law committed, and whether the necessary findings of fact are supported by substantial evidence in the record. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *GPU Industrial v. Pennsylvania Public Utility Commission*, 156 Pa.Commonwealth Ct. 626, 628 A.2d 1187 (1993).

13. West Penn and the Industrials argue that West Penn's methodology was set up to give a discount in rates when the QF came on-line before October of 1995. But the inclusion of that discount factor when the in-service date is after October 1995 creates a positive number that compounds the rates.

● October 1, 1995 was the planned date that the first unit of the 900 MW power station would come on-line.

● The EEPAs did not state that any QF was intended to avoid a specific unit of the 900 MW power station.

● All parties admit that the rate offered all of the QF developers at the time of the EEPAs and used throughout the proceedings was based on the blended cost of the three units for the 900 MW power station. The blending of costs gives the ratepayers, the PUC stated, the benefit of economy of scale resulting in a reduced rate. (PUC's opinion, slip op. at 24).

● There has never been an objection to the calculation of avoided costs based on the cost of the 900 MW power station as a whole, including the sunk costs [14] that would be necessary for building the first unit of the station, but would provide structures that must be present for each unit of the station to run.

From the foregoing, it is clear that the parties agreed to an avoided cost equal to the blended cost of the entire power station and treated it as if the entire avoided power station was to come on-line on October 1, 1995.

█ The central question then is whether the PUC can calculate a capacity cost rate based on in-service dates of the second and third units of the power station, coming on-line in 1997 and 1998, rather than based on when the entire station was treated by the parties as coming on-line, October 1, 1995, the date of the avoided cost calculation. Although this court has agreed that the PUC may alter some terms of an EEPA, the PUC may not extend the rate calculation to dates beyond the planned date for the avoided power station because that results in a rate that is greater than the full avoided cost to the utility.

In *Milesburg II*, the developer requested relief from certain contract deadlines that it asserted could not be met due solely to litigation delays. We held that where the utility subjects its purchase agreement to the scrutiny of the PUC, it incurs the risk that the

PUC may modify provisions of the contract if it concludes those provisions are not in accordance with PURPA and FERC regulations. We stated that the principle applies to terms relating to milestone dates as well as terms relating to price, that is, the PUC must order a rate for a power purchase for equivalent to, but no more than, the full avoided costs, citing 18 C.F.R. § 292.304(b)(2). *Milesburg II,* 135 Pa.Commonwealth Ct. at 37, 579 A.2d at 1348–49. We held, then, that the PUC properly extended the milestone deadlines of the original EEPA in order to ensure that litigation delays did not become the factor to determine whether a project proceeds or fails. *Id.* at 38–39, 579 A.2d at 1349. We also held that the capacity cost rate could be based on an in-service date later than the one agreed upon in the EEPA (but not beyond the planned in-service date of the avoided facility) because such a change did not affect the avoided cost but only reflected a closer match to the projected capacity needs of the utility. *Id.* In *Shannopin II,* we held that the PUC could change the financing closing date in the EEPA due to litigation delays, and that because that date was changed, the other dates in the EEPA which rely on that date were also postponed, including the in-service date of the QF. We reiterated that, despite a change in the in-service date, West Penn's avoided cost remained constant and the capacity cost rate is reasonable so long as the rates are at or below the full avoided cost of utility. *Shannopin II,* 150 Pa.Commonwealth Ct. at 370, 615 A.2d at 962.

█ While the PUC may alter terms of the contract due to litigation delay or terms that are not in compliance with PURPA, including terms relating to price, that discretion is not without limits. The PUC is without discretion to change terms of the EEPA by ordering a capacity cost rate that is greater than the full avoided cost to the utility. As calculated by the PUC, if Shannopin comes on-line on October 1, 1995, the date of West Penn's projected need for power, the capacity cost rate is 5.5933 cents per kilowatt

---

**14.** Sunk costs are the costs associated with the common facilities that would be required no matter how many units were built at the site.

hour. (R.R. 406a). This is the capacity cost rate that is equivalent to West Penn's full avoided cost as fixed at the time of the contract. Although the PUC may reform the EEPA to allow Shannopin to come on-line later than October 1, 1995,[15] the PUC cannot change the EEPA under PURPA to allow a capacity cost rate calculation that is higher than the capacity cost rate equal to a break-down of the avoided cost to West Penn for the power station on October 1, 1995, that is, 5.5933 cents per kilowatt hour. The PUC's calculations for Shannopin raises to a maximum of 8.0151 cents per kilowatt hour based on an in-service date for Shannopin of October 1, 1998. This is well above the capacity cost rate that is equivalent to the full avoided cost of West Penn and is an abuse of discretion and in violation of PURPA. Section 210(b) of PURPA, 16 U.S.C. § 824a–3(b); 18 C.F.R. § 292.304(a)(2) and (b)(2); *American Paper Institute.*

The error in calculating capacity cost rates beyond the date the parties agreed to in the EEPA, as to when the avoided power station was projected to come on-line, is apparent when comparing the rates established in *Burgettstown II* and those set by the PUC in this case. The maximum capacity cost rate set for the Burgettstown project is 5.71 cents per kilowatt hour for an in-service date of October 1, 1995 or thereafter. The maximum capacity cost rate for Shannopin was set by the PUC as 8.0151 cents per kilowatt hour, which is forty percent higher than the maximum capacity cost rate for Burgetts-town. Because both QF projects were agreed to in order for West Penn to avoid the same 900 MW power station projected to be needed on October 1, 1995, and the contracts were signed on the same day, the parties admit, and the PUC determined (PUC's opinion, slip op. at 24 and 27), that the avoided cost to West Penn is exactly the same for each project.[16] Because the avoided cost is exactly the same for each project,

the maximum capacity cost rates should be substantially the same rather than forty percent different. Also, if as here, one or both QFs are coming on-line after the date of the planned in-service date of the avoided facility as fixed at the time of the contract, the capacity cost rate cannot exceed the full avoided cost which is equivalent to the capacity cost rate calculated for the QF on the date of the projected need for power.

Mon Valley argues that the fact that the EEPA did not specify which unit of the power station Shannopin was intended to avoid means that the capacity cost rate can be calculated up to the projected dates for those units to come on-line because it could still avoid that power. Initially, we point out that the fact that the unit of the power station that each QF was supplanting was not specified supports the agreement of the parties that all of the QFs were intended to avoid the blended cost of the whole 900 MW power station as those costs were projected for October 1, 1995, the date when some power would be needed by West Penn, and that all of the QFs were intended to come on-line prior to that date. More importantly, while it is true that the 900 MW power station was to consist of three units, with the second and third coming on-line in 1997 and 1998, because of sunk costs, the parties agreed to a blended avoided cost based on an October 1, 1995 date when power from the first unit would come on-line. While West Penn and Shannopin could have agreed to an EEPA that specified one unit of the 900 MW power station that it was intended to avoid, and in that case the avoided cost of that unit (including a portion of the sunk costs in each unit) at the time its power would be needed may have been higher resulting in a higher maximum capacity cost rate, the parties did not make such a bargain.

The PUC stated that to limit the capacity cost rate to 1995 would penalize Mon Valley presumably because it fixed a date before it

15. We do not address whether the PUC could allow the QF to come on-line after the date of when the last unit of the avoided facility was planned to come on-line, however we note that the PUC determined in this case that it would not extend the calculations beyond October 1, 1998, in order to coincide with the planned on-line date for the third unit of the power station.

16. For any given in-service date, only a slight difference should result in the capacity cost rate due to the three-year difference in the term of the EEPAs for the projects.

could deliver power. However, Mon Valley is not prohibited from coming on-line after October 1, 1995, it is only the capacity cost rate that is maximized. The maximization is mandated by PURPA and the PUC cannot alter that part of a QF contract. Accordingly, we must reverse the PUC's calculations and that part of the PUC's order determining that the capacity cost rate for Shannopin may be calculated and continues to rise for on-line dates later than October 1, 1995 because the capacity cost rate calculated for an on-line date of October 1, 1995 is the maximum capacity cost rate available to Shannopin because it is equal to the full avoided cost to West Penn.

### IV.

█ West Penn argues that the recalculation proceeding is moot and the Shannopin QF project no longer exists because Mon Valley failed to maintain adequate site control. The PUC found that, because Mon Valley promptly arranged for a new steam host when the planned site went bankrupt, it maintained adequate control. The PUC also found that, if West Penn questions the QF status of the Shannopin project, it could file a petition with FERC. The record establishes that at the time Mon Valley lost its steam host, no action was taken to decertify the QF. West Penn filed neither a petition to decertify the QF or for a declaratory order from FERC. *See Independent Energy Producers, Inc. v. California Public Utilities Commission*, 36 F.3d 848 (9th Cir.1994). Because there is substantial evidence in the record for the PUC findings that Mon Valley promptly corrected the loss of the steam host, and because a specific steam host was not named in the EEPA, there was no basis to conclude that Mon Valley lost its QF status or that the contract was violated. The PUC is affirmed in that part, and West Penn continues to remain obligated under the EEPA.

### V.

█ West Penn summarily argues that the PUC did not properly update all of the inputs in the calculation to the time of the contract signing, relying on the statement of its expert, Albert F. Kave. Kave stated that the AFUDC (Additional Funds Used During Construction) and the inventory costs used in

the PUC's Attachment A were overstated. In response to Kave's statement, the PUC held that the AFUDC and inventory costs used were those found to be appropriate in its Burgettstown decision and upheld in *Burgettstown II*. Although Kave presented testimony contrary to the calculations in the tentative order, this does not mean that the PUC erred in not adopting that testimony. The PUC made findings on this matter in its Burgettstown decision (PUC's opinion and order of November 24, 1992, Docket No. 4–880284), and we agree that, because those inputs were approved in *Burgettstown II*, they were appropriate in this case because the calculation is based on the same avoided plant and the EEPA was signed on the same day.

### VI.

West Penn also argues that the PUC's order was in error because it relied on stale data. It argues that FERC recently established that QF rates cannot exceed the avoided cost to the utility, and that stale data should not be relied on to support the avoided cost calculation if there is no current need for power, renewing its argument that it does not need the power it contracted for in the EEPA. In *In re Southern California Edison Company*, F.E.R.C. No. EL95–16–000 and No. EL95–19–000, 1995 WL 169000 issued February 23, 1995, the decision relied on by West Penn, FERC stated that it has "grave concerns about the need for this capacity and the staleness of the data relied upon by the California Commission." *Id.* slip op. at 26. However, FERC expressly declined to address the issue of stale data and decided the case on other grounds. *Id.* This court recently rejected West Penn's argument on this issue and we see no need to address it further. *West Penn Power Company v. Pennsylvania Public Utility Commission*, —— Pa.Commonwealth Ct. ——, 659 A.2d 1055 (1995). We affirm that part of the PUC's order.

Accordingly, the order of the PUC is affirmed in part and reversed in part. The case is remanded for a recalculation of capacity cost rates for the Shannopin QF project that does not exceed the full avoided cost to West Penn, as set at the time of agreement, based on the blended costs of the 900 MW

power station planned to be in-service on October 1, 1995. On remand, the PUC should use the capacity cost rates established for the Burgettstown project, as upheld in *Burgettstown II,* as a guide, with the only difference being related to the three-year difference in the term of the contracts. The other differences in the contracts, such as the 11–month difference in original in-service dates, are not applicable where the rate is maximized because that difference is caused by the application of the discount for coming on-line earlier than the planned in-service date of the planned power station. The capacity cost rate should be maximized as calculated for the in-service date of Shannopin on October 1, 1995 and will not change due to an actual in-service date of the QF after that date. The order is affirmed only in that part determining that the recalculation proceeding is not moot and relying on the data known at the time of the contract between the parties.

### ORDER

AND NOW, this 20th day of July, 1995, the order of the Pennsylvania Public Utility Commission, dated December 1, 1994, No. P–880286 is affirmed in part and reversed in part. The order is affirmed insofar as it determined the recalculation proceeding is not moot and that there was no error in relying on the data known at the time of the contract between the parties. The order is reversed insofar as it calculated and approved capacity cost rates that are greater than the full avoided cost or the equivalent, the rate for an in-service date of October 1, 1995. The case is remanded to the Pennsylvania Public Utility Commission for a recalculation of capacity cost rates that duplicate those rates previously approved for the Burgettstown project, as discussed in our opinion in this matter, with the only adjustment for the three-year difference in term of the contract.

Jurisdiction relinquished.

### ORDER

AND NOW, this 25th day of September, 1995, the application for reargument or reconsideration filed by intervenor Mon Valley Energy Corporation in the above-captioned matter is hereby granted for reconsideration of the need for a remand to the Pennsylvania Public Utility Commission. Upon reconsideration, this Court's order dated July 20, 1995, is modified and restated as follows:

The order of the Pennsylvania Public Utility Commission, dated December 1, 1994, No. P–880286 is affirmed in part, reversed in part and modified in part. The order is affirmed insofar as it determined the recalculation proceeding is not moot and that there was no error in relying on the data known at the time of the contract between the parties. The order is reversed insofar as it calculated and approved capacity cost rates that are greater than the full avoided cost or the equivalent, the rate for an in-service date of October 1, 1995. The order is modified to provide that the allowable capacity cost rate for an in-service date of October 1, 1995 or later shall be equal to 5.5933 cents per kilowatt-hour, in accordance with pages 1–5 only of Attachment A to the Pennsylvania Public Utility Commission's order.